WILLIAM BLAIR AND COMPANY, L.L.C., Plaintiff-Appellant, v. FI LIQUIDATION CORPORATION, formerly known as Forms, Inc., a/k/a Spectra Graphics, *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—04—1061

Opinion filed June 6, 2005.

326

Frederick V. Lochbihler and David S. Barritt, both of Chapman & Cutler, L.L.P., of Chicago, for appellant.

Alan S. Madans, of Rothschild, Barry & Myers, of Chicago, for appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff-appellant, William Blair & Company, L.L.C. (hereinafter Blair), appeals from the denial of its motion for summary judgment and the grant of summary judgment in favor of defendants-appellees FI Liquidation Corporation, formerly known as Forms, Inc., also known as Spectra Graphics, Newton Business Forms Corporation, and Newton Business Forms Corporation (hereinafter collectively Spectra). Blair contends that the undisputed evidence revealed in the extrinsic submissions of the parties established that Spectra owed Blair fees under a contract in which Spectra hired Blair to help arrange for Spectra's sale to or merger with another company. At worst, Blair argues, the evidence was equivocal, requiring resolution through a trial. Spectra, on the other hand, contends that the circuit court cor-

rectly determined that the undisputed evidence allowed only the conclusion that Spectra owed Blair no fees. For the following reasons, we reverse and remand.

## I. FACTUAL BACKGROUND

This case arises from cross-motions for summary judgment. As such, the following factual background is based on the parties' pleadings, affidavits, depositions, admissions, and exhibits. These include, in pertinent part, the contract (engagement letter) between Blair and Spectra and various drafts of that contract, several business letters, various documents created by Blair in connection with its contractual obligations, the depositions of Blair and Spectra personnel, as well as the affidavits and reports of the parties' experts. The parties do not dispute the facts contained within these submissions but only the inferences that can be drawn from these facts and their significance under the controlling principles of contract law.

In the spring of 1995, Laurence Weiss, one of Spectra's cofounders, contacted Blair, an investment banking firm, to help arrange for Spectra's sale to or merger with another company. On April 3, 1995, Blair initially presented its standard engagement letter to Spectra which proposed that Blair would provide the following services:

"a. Blair will familiarize itself to the extent it deems appropriate with the business, operations, financial condition and prospects of the Company and its subsidiaries;

b. Blair will prepare a valuation of the Company and present it in such form as it shall consider appropriate to the Board of Directors of the Company;

c. Blair will identify a number of possible participants in the Possible Transaction [sale or merger], which participants may include parties to whom Blair has rendered or is now rendering investment banking services;

d. Upon receipt of express authorization from the Company, Blair will approach one or more of such possible participants, using material prepared by the Company with the assistance of Blair;

e. Blair will participate with the Company and its counsel in negotiations relating to the Possible Transaction; and

f. Blair will participate in meetings of the Board of Directors of the Company (such participation to be in person or by telephone, as appropriate) at which the Possible Transaction is to be considered and, as appropriate, shall report to the Board of Directors with respect thereto."

In exchange for these services, the proposed engagement letter provided in section two:

"The Company agrees to pay Blair a quarterly retainer fee of

$25,000, payable in advance, with the first installment due upon the execution of the engagement letter. In the event that the Possible Transaction is consummated, the Company will pay or cause to be paid to Blair a fee equal to 1.5% of the total consideration received by the Company and its stockholders as a result of such consummation, less the aggregate of all fees theretofore paid pursuant to this Section 2."

Section five of the proposed engagement letter, which the parties referred to as the "tail provision," allowed for either party to terminate their relationship at any time with written notice, providing however:

"if the Company shall consummate any Possible Transaction within twenty-four months following such termination with any party (i) which Blair has identified, (ii) in respect of which Blair has rendered advice or (iii) with which the Company has directly or indirectly held discussions prior to such termination, then Blair shall be entitled to the full amount of the fee contemplated by the last sentence of Section 2 hereof."

Spectra did not accept the engagement letter as written, but returned it to Blair with some handwritten changes. Most notable of Spectra's changes were those in the tail provision: "twenty-four months" was changed to "twelve months," subsections (i) and (ii) were deleted, and the word "substantive" was inserted before "discussions."

On May 3, 1995, Blair wrote back to Spectra asking, among other things, that the word "substantive" be deleted. During a telephone conversation on May 31, 1995, Weiss indicated that Spectra was unwilling to delete "substantive" unless "material" was put in its place. John Ettelson, a principal of Blair, commented that Blair would prefer neither qualifier, but chose to stay with "substantive" rather than use "material."

Blair incorporated these agreed-upon changes into a new draft of the engagement letter that the parties signed on August 24, 1995. The services Blair agreed to perform remained identical to those enumerated in its original proposed engagement letter. However, section two of the engagement letter, which described Blair's fees, was changed to the following:

"The Company agrees to pay Blair a quarterly retainer fee of $25,000, *due upon the execution of this engagement letter*. In the event that the Possible Transaction is consummated, the Company will pay or cause to be paid to Blair a fee equal to (i) 1.5% of the Total Consideration received *up to $30 million, plus (ii) 6% of the Total Consideration received over $30 million* by the Company and its stockholders as a result of such consummation, less the ag-

gregate of all fees theretofore paid pursuant to this Section 2. *'Total Consideration' shall mean all cash and securities (whether debt or equity) paid for the stock and/or assets of the Company (including any payment for preferred stock, unexercised stock options or non-compete arrangements) in the Possible Transaction. Total Consideration shall not include the repayment or assumption of the Company's funded debt or other liabilities as disclosed on the balance sheet as of the date of closing of the possible transaction."* (Emphasis added to show changes from the original.)

Additionally, the relevant part of the tail provision was changed to the following:

"if the Company shall consummate any Possible Transaction within *twelve* months following such termination with any party with which *Blair or* the Company has directly or indirectly held *substantive* discussions prior to such termination, then Blair shall be entitled to the full amount of the fee contemplated by the last sentence of Section 2 hereof." (Emphasis added.)

Shortly thereafter, Spectra deferred any activity under that engagement letter because of what it described as "temporary production problems." Approximately $2^1/2$ years later, Spectra decided that the time was right to again pursue a sale or merger. Spectra and Blair then signed a second engagement letter, dated January 30, 1998, which was identical to the August 24, 1995, engagement letter in all respects except that it acknowledged that the $25,000 retainer fee had already been paid. The parties did not renegotiate any of the terms of the 1998 engagement letter.

Pursuant to the second engagement letter, Blair prepared a "confidential descriptive memorandum" (CDM), a document commonly used in the investment banking industry to generate interest and provide information to prospective purchasers of businesses. The CDM created by Blair for Spectra stated that it did not constitute an offer to sell and that it did not guarantee the accuracy of the information it contained. Nonetheless, it provided fairly detailed information about Spectra, including a history of the company, a summary of its financial data, its strategies, equipment, technology, marketing, distribution, competition, management, and employees. The CDM also contained a "proposed transaction" for the sale of Spectra which set forth Spectra's goals with regard to the sale and advised that all indications of interest and requests for further information should be directed to Blair.

Next, pursuant to the engagement letter, Blair identified nearly 50 potential companies and contacted them to see if any had interest in receiving information about Spectra. As was the standard practice in investment banking, if a company expressed any interest, Blair would

require that a confidentiality agreement be signed before providing a CDM in order to protect Spectra's confidential business information. The confidentiality agreement provided that the recipient of the CDM would use the information solely to evaluate the purchase opportunity and would not hire any of Spectra's employees. Of the companies contacted, approximately 25 agreed to the confidentiality agreement and were sent CDMs. Of these companies that received CDMs, approximately five or six submitted written expressions of interest, and of those companies, three went further by touring Spectra's facilities, meeting with company personnel, and "talking numbers." One company, Mail-Well, went further and obtained detailed financial information not contained in the CDM. In September of 1998, Mail-Well experienced a downturn in its stock price and terminated its inquiries into Spectra. The other two companies that had expressed particular interest, Big Flower Press Holdings, and Golder, Thoma, Cressey, Rauner, Inc., similarly abandoned their inquires into Spectra.

One of the approximately twenty-five companies that signed confidentiality agreements and received CDMs was G.T.C. Transcontinental Group, Ltd. (Transcontinental). Blair's contacts with Transcontinental, like those with all the other companies, were documented in a call log kept by two of Blair's employees, Christopher Spahr and Mark Brady. Although both Spahr and Brady testified in their depositions that they could not specifically recall any of the phone calls to Transcontinental, in his affidavit, Spahr states that the call log was intended to be an accurate summary of the contacts Blair had with Transcontinental. On February 2, 1998, Spahr first contacted Transcontinental and spoke to the chief executive officer's (CEO) assistant,[1] Ms. Rabeau. Over the next month, Spahr and Brady made several calls to Transcontinental and always spoke with Ms. Rabeau. She assented to having a confidentiality agreement sent to her company. Spahr and Brady sent the agreement and Transcontinental faxed it back with some changes. Blair accepted the changes, and the agreement was thereafter signed by Transcontinental's attorney. Blair then sent Transcontinental the CDM. After sending the CDM, Spahr and Brady made five more phone calls to Transcontinental consisting of the following. On March 9, 1998, they left a message for the CEO, Mr. Marcoux, to see if he had any questions. On March 19, 1998, they called to remind Transcontinental of their deadline. On March 18, 1998, they called and set up a date on which they could call and speak with Mr. Marcoux. On that date, March 23, 1998, Mr. Marcoux was

---

[1]Blair refers to Ms. Rabeau as an executive assistant in its brief, while Blair's call log and Spectra refer to her as a secretary.

unavailable. Finally, on March 26, 1998, they called and left another message for Mr. Marcoux for which they received no response. There were no other contacts between Blair and Transcontinental prior to the initiation of this case.

In a letter dated January 20, 1999, Weiss terminated the engagement of Blair because no buyer had been found. Weiss also requested that Blair send him a list of all the companies contacted, those sent CDMs, and those with which "substantive discussions" were held. Weiss posited that discussions were held with only three companies (Mail-Well, Big Flower Press Holdings, and Golder, Thoma, Cressey, Rauner, Inc.), and "substantive" only with Mail-Well. Blair responded by sending two lists: the first contained the list of those companies that received CDMs, and the second contained the companies contacted that did not receive CDMs. Blair did not clarify which companies it considered as having been participants in substantive discussions. The three companies identified by Weiss were checked on Blair's first list, but no explanation of what the checkmarks were intended to mean was included.

Subsequently, on April 7, 1999, Spectra engaged another investment banking firm, Berenson Minella & Company (Berenson), to assist it in a sale or merger. Berenson, like Blair, identified and contacted a number of potential companies. One of the companies contacted was Transcontinental, and in October of 1999, Transcontinental acquired Spectra, whereupon Spectra paid Berenson a success fee of $877,500.

In a letter dated June 21, 2001, Blair demanded payment from Spectra under their engagement letter's tail provision, claiming that it had substantive discussions with Transcontinental and that the sale via Berenson took place within the 12-month period set forth in the engagement letter. On July 23, 2001, Weiss responded that while he was aware that Blair had sent Transcontinental a CDM after they had signed a confidentiality agreement, he was not aware of any discussions with Transcontinental, substantive or otherwise. Weiss then requested that Blair provide him with details of the discussions Blair was referring to.

On January 29, 2002, Blair filed suit against Spectra in the circuit court of Cook County for breach of contract alleging, as above, that it had substantive discussions with Transcontinental within the 12-month period and was, therefore, entitled to a fee under the tail provision of the engagement letter. Spectra replied by denying that any substantive discussions had taken place. Spectra also raised three affirmative defenses. First, Spectra argued that Blair was not entitled to relief because it violated the Business Brokers Act of 1995 (815 ILCS 307/10—1 *et seq*. (West 2002)) by not registering with the Illinois

Secretary of State as required. Second, Spectra argued that even if Blair did have "substantive discussions" with Transcontinental, Spectra could not be compelled to pay any fee because of how the engagement letter was written. The tail provision refers to the "fee contemplated by the last sentence of Section 2 hereof" while the actual last sentence of that section does not directly deal with the fee. Third, Spectra argued that Blair did not conform to the agreement set forth in the engagement letter in that Blair did not receive express authorization from Spectra before contacting Transcontinental.

On September 27, 2004, the circuit court heard the parties' cross-motions for summary judgment in which they agreed that the facts were not in dispute. The court ruled for Spectra, finding that under the commonly understood meaning of the word "substantive," no substantive discussions had taken place with Transcontinental that would entitle Blair to a fee under the tail provision of the engagement letter.

## II. ANALYSIS

### A. Contentions

Blair contends on appeal that the circuit court erred in granting summary judgment to Spectra because the uncontroverted facts support the conclusion that Blair, not Spectra, is entitled to judgment as a matter of law. Specifically, Blair contends that it satisfied the "substantive discussions" requirement under the tail provision by negotiating and executing the confidentiality agreement with Transcontinental, and also by sending Transcontinental the CDM and making follow-up telephone calls. In support of its contention, Blair initially argues that the term "substantive discussions" should be given its plain and ordinary meaning, but then contends that it should be read within the context of an investment banker's sales process. To this end, Blair relies on an affidavit of an expert in the field of investment banking who opined that Blair's actions constituted "substantive discussions" within that field. Blair further argues that even if the tail provision is determined to be ambiguous and extrinsic evidence is allowed under the parol evidence rule, it should be construed against Spectra under the principle of *contra proferentem* because Spectra selected the ambiguous language. Finally, Blair argues alternatively that there were genuine issues of material fact that precluded summary judgment in favor of Spectra in that factual assessments were necessary in determining which definitions of "substantive discussions" to apply and whether Blair's communications constituted substantive discussions.

Spectra, on the other hand, contends that the judgment of the

circuit court in its favor should be upheld because Blair had no substantive discussions with Transcontinental. As does Blair, Spectra argues that "substantive discussions" should be given its ordinary meaning, but Spectra comes to an obviously different conclusion. According to Spectra, Blair's acts of creating the CDM, obtaining the confidentiality agreement, and sending the CDM to Transcontinental were merely preliminary steps necessary before substantive discussions could take place. Spectra points out that Blair was fully compensated for these services by the initial $25,000 retainer fee. Although Spectra argues that contract interpretation is solely within the court's purview and, therefore, expert testimony is inappropriate, Spectra, nevertheless, offers its own expert to counter Blair's expert. Spectra further argues that even if the tail provision were ambiguous, it should not be interpreted against Spectra under the principle of *contra proferentem* because the engagement letter started as Blair's form and the changes that were made were negotiated. Finally, Spectra urges that even if Blair were otherwise entitled to summary judgment, Spectra should, nonetheless, still prevail because of its affirmative defenses. Spectra reasserts two of the affirmative defenses it raised in the circuit court: first, that the tail provision's referral to the wrong sentence for fees makes it unenforceable, and second, that Blair did not obtain the requisite authorization before contacting Transcontinental.

## B. Discussion

Summary judgment is appropriate where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in a light most favorable to the nonmovant, present no issue of material fact and show that the movant is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2002); *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257, 811 N.E.2d 670, 674 (2004). Our function on review of summary judgments is limited to determining whether the circuit court correctly concluded that no genuine issue of material fact had been raised and, if none was raised, whether judgment as a matter of law was correctly entered. *Diefendorf v. City of Peoria*, 308 Ill. App. 3d 465, 467-68, 720 N.E.2d 655, 657 (1999). In determining whether a genuine issue of material facts exists, we must construe the evidence strictly against the movant and liberally in favor of the opponent. *Kerr v. Illinois Central R.R. Co.*, 283 Ill. App. 3d 574, 583, 670 N.E.2d 759, 766 (1996). The party opposing summary judgment need not prove his case to defeat the motion, but must present some factual basis that would arguably entitle him to judgment. *Flint v. Court Appointed Special Advocates of Du Page County, Inc.*, 285 Ill. App. 3d 152, 162,

674 N.E.2d 831, 839 (1996); *Jeanblanc v. Sweet*, 260 Ill. App. 3d 249, 253, 632 N.E.2d 623, 625 (1994). When parties file cross-motions for summary judgment, the court is invited to decide the issue on summary judgment as a matter of law; however, summary judgment is nevertheless inappropriate if factual questions regarding a material issue exist. *Giannetti v. Angiuli*, 263 Ill. App. 3d 305, 306, 635 N.E.2d 1083, 1085 (1994).

■ Contract construction and interpretation are generally well suited to disposition by summary judgment. *Bankier v. First Federal Savings & Loan Ass'n of Champaign*, 225 Ill. App. 3d 864, 869, 588 N.E.2d 391, 394 (1992); *Continental Mobile Telephone Co. v. Chicago SMSA Ltd. Partnership*, 225 Ill. App. 3d 317, 322, 582 N.E.2d 1169, 1173 (1992). When, however, the language of a contract is ambiguous, its meaning must be ascertained through a consideration of extrinsic evidence and summary judgment is, therefore, inappropriate. See *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 272, 586 N.E.2d 1211, 1215 (1992) ("In cases involving contracts, there is a disputed fact precluding summary judgment when the material writing contains an ambiguity which requires admission of extrinsic evidence"); *Ollivier v. Alden*, 262 Ill. App. 3d 190, 195, 634 N.E.2d 418, 421-22 (1994); *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.*, 137 Ill. App. 3d 550, 558, 484 N.E.2d 1178, 1184 (1985); see also *City of Chicago v. Dickey*, 146 Ill. App. 3d 734, 739, 497 N.E.2d 390, 394 (1986) ("In light of a finding of ambiguity, summary judgment was *per se* inappropriate, particularly in light of the court's failure to accord the parties an evidentiary hearing on the matter"); but see *Ridenhour v. Mollman Publishing Co.*, 66 Ill. App. 3d 1049, 1051, 383 N.E.2d 803, 804-05 (1978); *Hernandez v. Schittek*, 305 Ill. App. 3d 925, 933, 713 N.E.2d 203, 209-10 (1999) (stating that if "extrinsic facts are uncontroverted, the trial court must determine the [ambiguous] contract's meaning as a matter of law").

A contract term is ambiguous if it can reasonably be interpreted in more than one way due to the indefiniteness of the language or due to it having a double or multiple meaning. *Zurich Midwest, Inc. v. St. Paul Fire & Marine Insurance Co.*, 159 Ill. App. 3d 961, 963, 513 N.E.2d 59, 60 (1987). A contract is not ambiguous, however, if a court can ascertain its meaning from the general contract language. *Village of Glenview v. Northfield Woods Water & Utility Co.*, 216 Ill. App. 3d 40, 48, 576 N.E.2d 238, 244 (1991). Whether a contract is ambiguous is a question of law for the trial court. *Village of Glenview*, 216 Ill. App. 3d at 48, 576 N.E.2d at 244. However, the mere fact that the parties disagree as to the meaning of a term does not make that term ambiguous. *Johnstowne Centre Partnership v. Chin*, 99 Ill. 2d 284, 288, 458 N.E.2d 480, 481 (1983).

■ In the absence of ambiguity, a court must construe a contract according to its own language, not according to the parties' subjective constructions. *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748, 551 N.E.2d 340, 342 (1990). Unless a contract clearly specifies its own meanings, a court must interpret the words of the contract with their common and generally accepted meanings. *J.M. Beals*, 194 Ill. App. 3d at 748, 551 N.E.2d at 342. Finally, a court must construe the words of a contract within the context of the contract as a whole. *Board of Trade v. Dow Jones & Co.*, 98 Ill. 2d 109, 122-23, 456 N.E.2d 84, 90 (1983).

Despite the fact that both Blair and Spectra initially contend that no genuine issue of material fact exists and that the phrase "substantive discussions" is not ambiguous, we are not compelled to simply take their word for it but, rather, may review that question *de novo*. See *Giannetti*, 263 Ill. App. 3d at 312, 635 N.E.2d at 1085. The record makes clear that there is no dispute as to the actions that were taken by the parties and the specific events that actually occurred. What is in dispute is whether Blair's actions with regard to Transcontinental may be characterized as "substantive discussions" from the face of the agreement or, for that matter, based upon the extrinsic evidence submitted by the parties. Our review thus begins with an inquiry into whether the term "substantive discussions," as deployed in the tail provision of the engagement letter, is ambiguous. For the reasons that follow, we find that the term is ambiguous. As shall be discussed later on, if we find that the contract is ambiguous on its face, we must then consider whether summary judgment can be awarded based upon the extrinsic evidence submitted.

As discussed above, in determining whether contract language is ambiguous, the words employed should be given their ordinary and usual meaning. *J.M. Beals*, 194 Ill. App. 3d at 748, 551 N.E.2d at 342. Relying on this rule, the parties both offer various dictionary definitions of the relevant terms. Blair offers the following definitions for "substantive": (i) "belonging to the substance of the thing," or (ii) "having substance: involving matters of major or practical importance to all concerned." Webster's Ninth Collegiate Dictionary 1176 (9th ed. 1986). Additionally, Blair and Spectra both define "substantive" as "an essential part or constituent or relating to what is essential." Black's Law Dictionary 1429 (6th ed. 1990). As for "discussion," Blair defines the word as the "formal treatment of a topic in speech or writing" (Webster's Ninth Collegiate Dictionary 362 (9th ed. 1986)), while Spectra defines it as an "earnest conversation," or a "consideration or examination by argument, comment, [or] debate" (American Heritage Dictionary (4th ed. 2000)).

In addition to the dictionary definitions for "substantive" offered by the parties, Webster's Dictionary also defines "substantive" as including: "considerable in amount or number," and "definite rather than contingent in status." Webster's Third New International Dictionary 2280 (1993). Manifestly, under any one of these definitions, the term "substantive" is imprecise and not ascertainable simply from the four corners of the instrument. Looking solely to the engagement letter, it is not possible to determine with precision what the term "substantive" is intended to connote, as the contract does not specifically define the term or further describe what it means. Under the engagement letter, Blair agreed to perform six enumerated services of which only two involved contact with a potential purchasing company. Subsection (d) says: "Blair will approach one or more of such possible participants, using materials prepared by [Spectra] with the assistance of Blair." There is no doubt from the record that Blair approached Transcontinental in accordance with this enumerated task, but the description of this task does not help us determine what would have had to occur once Blair "approached" Transcontinental in order for it to be a "substantive discussion." Similarly, subsection (e) of the engagement letter states: "Blair will participate with [Spectra] and its counsel in negotiations relating to the Possible Transaction." Although it seems likely that "negotiations" would constitute "substantive discussions," there is ambiguity as to what the term "negotiations" itself entails. Notably, this subsection does not clearly foreclose the possibility that the negotiation of the confidentiality agreement constituted "negotiations relating to the Possible Transaction." In any event, however, if the parties had intended "negotiations" to be the test, they arguably would have used that term instead.

Blair would contend that even if there may be ambiguity as to how far "substantive discussions" extends, there can be no question that a discussion of the contents of the CDM could constitute a "substantive discussion." Spectra does not vigorously contest that a discussion of the contents of the CDM would satisfy the requirement of "substantive discussions" but, rather, primarily challenges Blair's contention that there was any discussion. Instead, Spectra contends that there was only a unilateral transmission of the CDM without any response or discussion whatsoever.

■ In point of principle, the fact that a term is ambiguous in one context does not necessarily make it ambiguous in another. Thus, for example, the word "substantive" may be ambiguous insofar as it pertains to confidentiality agreements, but would not be ambiguous insofar as it would exclude a simple call to a corporate secretary to elicit directions or a mailing address. Thus, arguably, a discussion

concerning the contents of a CDM would satisfy the requirement of "substantive," notwithstanding the indefiniteness of that term with regard to other, more preliminary discussions. See *Newsom v. United States*, 676 F.2d 647, 650 (Ct. Cl. 1982) (stating that the question of ambiguity is "not a simple yes-no proposition but involves placing the contractual language at a point along a spectrum"); *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed. Cir. 1988) ("When determining whether contract language is patently ambiguous, the language must be placed at a point along a spectrum of ambiguity"). However, even if discussions concerning the contents of a CDM were clearly and unambiguously substantive, a point which Spectra does not concede, it is not at all clear and unambiguous that the contacts between Blair and Transcontinental regarding the CDM constituted "discussions."

Blair argues that sending the CDM to Transcontinental and subsequently making several phone calls and setting up a conference call with the CEO constituted "substantive discussions." In this regard, Spectra disputes Blair's contention that any discussion occurred in relation to the CDM. After Blair sent the CDM to Transcontinental, Spahr and Brady made several phone calls to the company but never spoke with Transcontinental's CEO or anyone else with authority. Blair argues that it did not send an unsolicited CDM to Transcontinental but, rather, sent it only after numerous communications and the negotiation of the confidentiality agreement. Blair further contends that the CDM "communicated" its proposed sale to Transcontinental and that Transcontinental's CEO "bespoke" his temporary rejection by cancelling their scheduled conference call.

Blair defines "discussion" as the "formal treatment of a topic in speech or writing," while Spectra defines it as an "earnest conversation" or a "consideration or examination by argument, comment, [or] debate." Spectra argues that Blair's sending of the CDM and subsequent failure to speak to Transcontinental's CEO, or anyone else of authority, lacks the bilateral aspect that "earnest conversation" connotes. Spectra further argues that the tail provision's language supports its definition of "discussion" because it refers to substantive discussions *with* a third party. Spectra makes a reasonable argument for its understanding of the word; however, Blair also makes a reasonable argument. Blair did not send the CDM until after Transcontinental explicitly agreed that it wanted to see it. Although Transcontinental never returned with a written expression of interest, the negotiation and execution of the confidentiality agreement clearly expressed some level of interest on the part of Transcontinental. Further, Spectra does not contend that a discussion must be oral. Thus, the question becomes

at what point does a discussion occur. It is clear that at one end of the spectrum, complex and involved negotiations regarding Transcontinental's acquisition of Spectra would have constituted discussions. While we are not prepared to say that what occurred in this case absolutely does not fall within that spectrum, it is at best ambiguous and would require extrinsic evidence to determine what the parties intended in that respect. It may well be possible that the parties had intended that the term "discussions" would be satisfied by the mere transmission of the CDM to Transcontinental, particularly in light of Transcontinental's implied request for that transmission as inferred from the fact that it signed a confidentiality agreement to enable such a transmission to take place. However, such a determination cannot be made from the four corners of the engagement letter, but would require reference to extrinsic evidence and the weighing of that evidence.

While continuing to maintain that the terms are unambiguous, Blair argues that the meaning of "substantive discussions" depends on an understanding of the investment banking field as explained by its expert, Chester Gougis. In his affidavit and report, Gougis states that "substantive discussions" are not terms of art within the investment banking field. He therefore defines the terms using the same dictionary definitions supplied by Blair. However, he posits that Blair had "substantive discussions" with Transcontinental because the preparation and submission of a CDM, and the negotiation and execution of a confidentiality agreement are among the most important steps in selling a privately owned company. Further, in his opinion, the CDM and confidentiality agreement represent the bulk of the services investment bankers provide, and it would therefore be unreasonable for an investment banker to provide such services and not be entitled to compensation under a tail provision. Finally, Gougis avers that if the parties had intended some further step to be the "trigger" for Blair's right to a fee under the tail provision, such as an expression of interest or a letter of intent, the parties would have so specified because such requirements would be excessively strict given the traditional role of investment bankers.

Because Spectra is itself seeking summary judgment, it apparently refrains from arguing that Blair's use of expert testimony constitutes an implicit admission by Blair that the terms are ambiguous. Instead, Spectra contests Blair's use of its expert and argues that the construction and interpretation of contracts is a question of law for the court and, therefore, expert testimony is irrelevant. We agree with Spectra that in the absence of ambiguity contract interpretation is a question of law for which expert testimony would not be appropriate. See *Dawe's Laboratories, N.V. v. Commercial Insurance Co.*, 19 Ill. App. 3d 1039,

1050, 313 N.E.2d 218, 226 (1974) ("The meaning of the language used in the policy exclusion, in the frame of reference to the undisputed facts established in this record, is a matter of law for decision by the court. (*Cohen v. Northwestern National Life Insurance Co.*, 124 Ill. App. 2d 15, 18, 259 N.E.2d 865[, 866 (1970)]). Expert opinion on a problem of this type is inadmissable and patently unacceptable"); *William J. Templeman Co. v. Liberty Mutual Insurance Co.*, 316 Ill. App. 3d 379, 390, 735 N.E.2d 669, 679 (2000) ("as the construction and interpretation of an insurance policy is a question of law, we fail to see the relevance of plaintiffs' expert witness"); *Pietrzak v. Rush-Presbyterian-St. Luke's Medical Center*, 284 Ill. App. 3d 244, 252, 670 N.E.2d 1254, 1259 (1996) ("This court has repeatedly held that language interpretation is a question of law for the court so that expert linguistic testimony may be disallowed"). However, a court can properly consider extrinsic evidence, such as an expert's opinion, on a provisional basis for the limited purpose of testing whether a contract is ambiguous. See *Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.*, 49 Ill. App. 3d 258, 263, 364 N.E.2d 939, 943 (1977) (" 'courts frequently admit extrinsic evidence provisionally, not for the purpose of "varying or contradicting" the writing, but to determine the fact that it is indeed unambiguous' "), quoting 4 W. Jaeger, Williston on Contracts § 601, at 311 (3d ed. 1961); *Baird & Warner, Inc. v. Ruud*, 45 Ill. App. 3d 223, 229, 359 N.E.2d 745, 750 (1976) ("The court properly admitted evidence of the preliminary negotiations initially to determine if there was an ambiguity in the contract and then, if there was, to determine the proper resolution of that ambiguity"); see also *Village of Glenview*, 216 Ill. App. 3d at 48, 576 N.E.2d at 244 (it is within the trial court's discretion to determine that the court did not need assistance in order to comprehend the meaning of a contract term).

■ Thus, courts may refer to extrinsic evidence to determine that words, seemingly unambiguous within the four corners of a contract, are, nevertheless, blatantly ambiguous within the broader context of the parties' dealings. See 11 R. Lord, Williston on Contracts § 30:5 (4th ed. 1999). But this cannot be transmuted into a principle that courts may summarily look to extrinsic evidence to transform language which is ambiguous on its face into unambiguous language by reference to extrinsic evidence. See 11 R. Lord, Williston on Contracts §§ 30:4, 30:5, 30:6 (4th ed. 1999). Such reference to extrinsic evidence would concede the ambiguity of the term and the need to ascertain the intent of the parties. See 11 R. Lord, Williston on Contracts §§ 30:4, 30:5, 30:6 (4th ed. 1999). Thus, Blair's assertion that the terms can only be understood within the context of investment banking as

explained by its expert is inconsistent with its assertion that the terms are unambiguous.

Blair, nevertheless, argues that its expert testimony may be used as a factual backdrop to assist in the *application* of the contract terms rather than to assist in the *interpretation* of the language. In support of this contention, Blair cites *American College of Surgeons v. Lumbermens Mutual Casualty Co.*, 142 Ill. App. 3d 680, 702, 491 N.E.2d 1179, 1194 (1986), in which we stated: "It is a proper rule of expert testimony to assist the jury to understand and apply the terms of a contract." Blair's reliance on *American College of Surgeons* is misguided in that if the language were unambiguous as Blair contends, its interpretation would then be a question of law for the court, not a question of fact for the fact finder. *Bankier*, 225 Ill. App. 3d at 869, 588 N.E.2d at 394. Thus, the opinion of Blair's expert may be relevant in the construction of the contract at trial, but it cannot be used to support Blair's motion for summary judgment and its contention that the subject terms are unambiguous.

Thus, the circuit court was correct in denying Blair's motion for summary judgment. The same principles, however, would apply to make Spectra's motion for summary judgment equally unavailing because the reasons that make "substantive discussions" ambiguous with regard to Blair apply equally to Spectra. Spectra, however, urges us to adopt its interpretation of "substantive discussions," which it contends is supported by various other cases that have dealt with the terms, as well as by Weiss's understanding of them. First, Spectra cites to the use of the phrase "substantive discussions" in three other cases. In *Board of Education, Le Roy Community Unit School District No. 2 v. Illinois Educational Labor Relations Board*, Spectra notes, the court described a meeting between the parties as their "first substantive discussion" even though they had previously met and exchanged contract proposals. *Board of Education, Le Roy Community Unit School District No. 2 v. Illinois Educational Labor Relations Board*, 199 Ill. App. 3d 347, 353, 556 N.E.2d 857, 861 (1990). Then, in *National Labor Relations Board v. H&H Pretzel Co.*, Spectra notes, the court stated that "[n]o substantive discussions were held" at a meeting where union and employer exchanged contract proposals. *National Labor Relations Board v. H&H Pretzel Co.*, 831 F.2d 650, 652 (6th Cir. 1987). We find these cases inapplicable to the present case because neither deals with the definition or meaning of "substantive discussions" other than in a very general contextual sense.

Spectra also cites to *In re Marriage of Abma*, in which one of the issues was whether the trial court erroneously denied a motion for substitution of judge. *In re Marriage of Abma*, 308 Ill. App. 3d 605,

720 N.E.2d 645 (1999). The parties and the judge held a pretrial conference, and four months later, the respondent filed a motion for substitution of judge alleging that no substantive rulings had been made. *Abma*, 308 Ill. App. 3d at 607, 720 N.E.2d at 648. The judge denied the motion and the appellate court affirmed noting that such a motion would be "untimely if the parties have had an opportunity to discern the court's disposition toward the merits of the case." *Abma*, 308 Ill. App. 3d at 611, 720 N.E.2d at 650. The court also stated: "A ruling is considered 'substantial' in nature when it is directly related to the merits of the case." *Abma*, 308 Ill. App. 3d at 610, 720 N.E.2d at 650. Although *Abma* is clearly more applicable than the other cases cited by Spectra in that it deals with setting parameters on what is considered "substantive" or "substantial," it is still only applicable in a very limited and general sense. *Abma* involved interpretation of the Illinois substitution of judge statute (735 ILCS 5/2—1001 (West 2002)) and whether, in light of the polices behind that statute, a party was entitled to a substitution of judge as a matter of right. *Abma*, 308 Ill. App. 3d 605, 720 N.E.2d 645. What is "substantial" under those circumstances does not truly carry over to what is "substantive" in a private contract.

Next, Spectra urges us to look to Weiss's understanding of the terms "substantive discussions" as set forth in his deposition. Weiss testified that he understood "substantive discussions" to be those involving discussions about price, terms, form of payment, how the business will be run, meetings with management, and an expression of interest. Further, Weiss testified that substantive discussions are those dealing with the "heart of the matter," or its "essential elements." Spectra contends that this interpretation of the terms is consistent with the tasks Blair agreed to perform in the engagement letter. Although it is a primary goal of contract construction to give effect to the intentions of the parties at the time the contract was executed, that intention is to be determined objectively by examining the language the parties agreed upon rather than by any subjective explanation given in hindsight. *Bankier*, 225 Ill. App. 3d at 869, 588 N.E.2d at 394. Therefore, Weiss's explanation of how he understood the words "substantive discussions" is of little value to an interpretation of them. As for being consistent with the tasks Blair agreed to perform, as noted above, one of the enumerated services Blair agreed to perform involved taking part in negotiations with Spectra and a potential purchasing company. However, the fact that Blair did not complete one of the tasks it agreed to perform is not conclusive because the tail provision specifically provides that under certain circumstances Blair could still be paid even though the intended sale or merger, and

all its concomitant events, did not occur. In other words, as noted above, the fact that negotiations did not occur cannot, in and of itself, be a reason to deny compensation under the tail provision.

■ Having found that the terms are ambiguous despite the parties' contentions to the contrary, we now turn to the parties' alternative arguments that summary judgment would be warranted pursuant to their respective extrinsic submissions. As noted above, ordinarily, where contract language is ambiguous, and therefore must be decided on the basis of extrinsic evidence, summary judgment is inappropriate. See *Loyola Academy*, 146 Ill. 2d at 272, 586 N.E.2d at 1215; *Ollivier*, 262 Ill. App. 3d at 195, 634 N.E.2d at 421-22; *Ebert*, 137 Ill. App. 3d at 558, 484 N.E.2d at 1184; *Dickey*, 146 Ill. App. 3d at 739, 497 N.E.2d at 394. However, several cases have distinguished this general rule and held that if the extrinsic evidence available to construe ambiguous language is not in dispute, a court may, nevertheless, properly decide the issue as a question of law, as no question of fact is raised. *Ridenhour*, 66 Ill. App. 3d at 1051, 383 N.E.2d at 804-05; *Hernandez*, 305 Ill. App. 3d at 933, 713 N.E.2d at 209-10; see *Jewelers Mutual Insurance Co. v. Firstar Bank Illinois*, 213 Ill. 2d 58, 65, 820 N.E.2d 411, 415-16 (2004) (rejecting defendant's argument that contract ambiguity automatically requires a remand for findings of fact); 11 R. Lord, Williston on Contracts § 30:7 (4th ed. 1999); *Baker v. America's Mortgage Servicing Inc.*, 58 F.3d 321, 326 (7th Cir. 1995). Based on general summary judgment principles, we are inclined to agree that even if a contract is ambiguous on its face, summary judgment may nevertheless be appropriate if, predicated on the extrinsic submissions of the parties, no material issue of fact remains in dispute. In any case, however, summary judgement was inappropriate here because the contract is ambiguous *and* the extrinsic evidence and the inferences to be drawn therefrom are in dispute. Spectra contends that the extrinsic evidence leaves only the possibility that no "substantive discussions" occurred. Blair, on the other hand, argues the converse, that the extrinsic evidence supports only the conclusion that "substantive discussions" occurred, and that Blair is, therefore, entitled to its fee under the tail provision.

In its support, Spectra argues that it is clear from the parol evidence that Blair's original form, which merely called for "discussions," was significantly narrowed in scope by the parties' negotiated addition of "substantive." Thus, according to Spectra, the fact that the parties agreed to qualify "discussions" with "substantive" is enough to definitively show that the intent of the parties was to make payment under the tail provision conditional on something more than mere identification or contacting of prospects. In other words, Spectra

would contend that the fact that the parties qualified Blair's standard tail provision shows that the circumstances under which Blair would be entitled to its fee under its agreement with Spectra would be greater than the circumstances necessary to entitle Blair under its standard tail provision. Blair, on the other hand, contends that its agreement to the use of "substantive" over "material," shows that the parties intended that "substantive" would set a lower standard than "material" would have. Thus, according to Blair, this negotiation definitively shows that the parties intended that "substantive" would merely mean that the discussions would have to be more than purely trivial or ministerial communications, but not so great as "material."

■ Although the parties both make reasonable inferences from the parol evidence of their negotiations, those inferences are neither definitive nor undisputed and, consequently, they do not support summary judgment. *Hernandez*, 305 Ill. App. 3d at 933, 713 N.E.2d at 209-10. While we agree with Spectra's point, as likely would Blair, that the addition of "substantive" created a greater standard than Blair's original, unqualified "discussions," this greater standard does not definitively show that the parties intended that actions like those taken by Blair would not constitute "substantive discussions." Moreover, Blair vigorously contests Spectra's inference and, in fact, interprets the same parol evidence as requiring the opposite result. Additionally, although the fact that Blair opted for "substantive" rather than "material" shows that Blair considered "substantive" to create a lesser standard, that does not necessarily show that Spectra had that same understanding. Moreover, even if "substantive" is lesser than "material," the same problems with interpreting the meaning of a term apply equally to both words. Thus, the parties clearly dispute the inferences that can be drawn from the parol evidence of their negotiations.

Next, Blair and Spectra both argue that an understanding of the norms and standards of investment banking supports their respective positions with regard to what they intended "substantive discussions" to mean. As noted, Blair largely bases its argument on Gougis's expert opinion of the standard practices in investment banking. Blair therefore contends that the parties initially understood "substantive discussions" within the context described by Gougis, namely, that investment bankers, like Blair, primarily provide the services that Blair did, in fact, perform: creating the CDM, identifying prospects, contacting those prospects, executing confidentiality agreements, and sending CDMs. Thus, according to Blair, the fact that it completed the bulk of the services that investment bankers traditionally provide, and specifically those that involve contact with prospects, inherently quali-

344

fies the contact it had with Transcontinental as "substantive discussions."

However, Spectra does not agree with Gougis's summation of the investment banking process but, rather, contends that some greater contact was anticipated by the parties before the tail provision could be invoked. Spectra initially relies on the depositions of Blair's Brady and Spahr, as well as a letter from Spahr to Weiss, in which they described what steps are possible after a company signs an execution agreement and receives a CDM. These steps include: "extensive buyer due diligence, negotiation of a non-binding letter of intent, and ultimately, the drafting of a definitive stock purchase agreement." Thus, Spectra contends, Blair clearly understood "substantive discussion" within a much broader context than that described by Gougis. Furthermore, Spectra additionally disputes Gougis's opinion by offering its own expert. Spectra's expert opines in his report that confidentiality agreements are signed as a matter of routine by companies, like Transcontinental, that are seeking acquisition opportunities and therefore should not be considered substantive. Moreover, Spectra's expert opined that in the investment banking field "substantive discussions" would typically involve multiple meetings lasting several hours over the course of several weeks or months. Thus, although the parties' extrinsic submissions may be relevant to construing the ambiguous terms at trial, the inferences drawn from this evidence are certainly disputed, and, therefore, summary judgement was inappropriate. *Hernandez*, 305 Ill. App. 3d at 933, 713 N.E.2d at 209-10.

Next, Blair contends that regardless of any factual issue inherent in the extrinsic evidence, the circuit court should have granted its motion for summary judgement based on the principle of *contra proferentem*. Blair argues that Spectra, through its attorney, selected the word "substantive" and should therefore have the ambiguous term construed against it as the drafter. Spectra, on the other hand, argues that it should not be considered the drafter because the engagement letter started as Blair's form, and then Blair chose the word "substantive." Spectra points out that it initially suggested "substantive" but then, after Blair resisted, Spectra suggested "material" instead. Spectra contends that Blair then opted for "substantive" over "material," and thus Spectra should not be considered the drafter. Spectra further argues that it should not be considered the drafter because the above negotiations took place with regard to the original 1995 agreement, while the 1998 agreement, which is the subject of this case, came directly from Blair and was signed by Spectra without change or renegotiation. Moreover, Spectra correctly points out that *contra profe-*

*rentem* is a secondary rule of interpretation that should be invoked only after "ordinary interpretive guides have been exhausted." *Bunge Corp. v. Northern Trust Co.*, 252 Ill. App. 3d 485, 493, 623 N.E.2d 785, 791 (1993). Thus, even if we were to agree with Blair that Spectra was the sole drafter of the subject terms, Blair's invocation of *contra proferentem* is, at best, premature because as this case was decided by the circuit court on summary judgment, there has not yet been any attempt to resolve the ambiguity through the "ordinary interpretive guides"—namely, a consideration of the extrinsic evidence.

■ Finally, we address Spectra's affirmative defenses. First, Spectra argues that regardless of whether Blair's actions constituted "substantive discussions," it cannot be required to pay Blair a fee because the tail provision refers to "the full amount of the fee contemplated by the last sentence of Section 2." Spectra contends that the actual last sentence of that section does not identify the fee. In fact, the sentence in that section which identifies the fee and how it is to be calculated is the second of four sentences in that section. It states:

> "In the event that the Possible Transaction is consummated, the Company will pay or cause to be paid to Blair a fee equal to (i) 1.5% of the Total Consideration received up to $30 million, plus (ii) 6% of the Total Consideration received over $30 million by the Company and its stockholders as a result of such consummation, less the aggregate of all fees theretofore paid pursuant to this Section 2."

The actual last sentence, to which the tail provision refers, states: "Total Consideration shall not include the repayment or assumption of [Spectra's] funded debt or other liabilities as disclosed on the balance sheet as of the date of closing of the possible transaction." Spectra argues that this sentence does not purport to "contemplate" any fee and it therefore is not bound to pay Blair under the tail provision since there has been no identification of any fee. Spectra asserts that we cannot rewrite the tail provision even to correct a typographical error because Blair failed to seek reformation. Blair maintains that the undisputed parol evidence shows that in Blair's standard form engagement letter, which it initially presented to Spectra, the last sentence does, in fact, describe the fee, and that after the parties made changes to the contract they merely forgot to change the internal cross-reference contained in the tail provision. Blair further argues that reformation was unnecessary because the tail provision refers to the "full amount of the fee contemplated" and therefore is adequately clear despite the typographical error. We agree with Blair.

Although the actual last sentence of section two does not specifi-

cally identify the actual fee, that sentence implicitly refers to the fee identified in the earlier sentence and thus does not seriously call into question what the parties intended. As apparent on its face, this last sentence explains what is meant by "Total Consideration" as used in the earlier sentence in which the fee is set forth. Thus, contrary to Spectra's position, although the fee is actually identified in a preceding sentence, the last sentence, to which the tail provision refers, discussing how that fee is to be calculated, clearly "contemplates" that fee. This construction is in full accord with the ordinary meaning and usage of the word "contemplate." See Webster's Third New International Dictionary 491 (1993) (defining "contemplate" as "to view with sustained attention" and as "to presume or imply as a concomitant or result"). Thus, although the parties may have originally intended to refer to the earlier sentence in which the actual fee is set forth, the intention of the parties is nevertheless clearly manifest from its reference to the last sentence as well insofar as the last sentence unequivocally presupposes and "contemplates" the calculation of the fee described in the earlier sentence.

■ Spectra's second affirmative defense is based on a clause in the engagement letter that says Blair will approach potential companies "[u]pon receipt of express authorization from [Spectra]." Spectra argues that Blair received no such authorization before approaching Transcontinental and, therefore, Blair cannot claim its fee under the tail provision even if it had "substantive discussions." Blair, on the other hand, argues that its agents, Spahr and Brady, did receive express authorization from Weiss. Thus, there is clearly a question of fact on this issue. Moreover, Blair argues that even if it did not obtain prior approval before contacting Transcontinental, such a breach would not be material and therefore would not justify Spectra's nonperformance. In support, Blair contends that Spectra cannot now claim any hardship due to the alleged breach because Weiss testified in his deposition that he would have been in favor of contacting Transcontinental, with which Spectra ultimately consummated its sale.

Under general contract principles, only a material breach of a contract provision by one party will justify nonperformance by the other. See *Sahadi v. Continental Illinois National Bank & Trust Co. of Chicago*, 706 F.2d 193, 196 (7th Cir. 1983); *Anderson v. Long Grove Country Club Estates, Inc.*, 111 Ill. App. 2d 127, 139, 249 N.E.2d 343, 349 (1969); Restatement (Second) of Contracts § 229 (1981). The determination of whether a breach is material

"is a complicated question of fact involving an inquiry into such matters as whether the breach worked to defeat the bargained-for

objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage." *Sahadi*, 706 F.2d at 196.

The engagement letter does not purport to state that failure to comply with the express authorization condition would constitute a material breach, nor is there any other conclusive indication that the parties intended that such a breach would be material. As multiple factual questions are raised, summary judgment would be inappropriate on this issue.

## CONCLUSION

For the foregoing reasons the grant of summary judgment in favor of Spectra is reversed and the cause is remanded to the trial court for trial of the issues.

Reversed and remanded.

CAHILL, P.J., and McBRIDE, J., concur.