2022 IL App (1st) 210493-U

No. 1-21-0493

Second Division
December 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| LISA MULLIGAN-EHRIE, | ) | Cook County, |
| | ) | County Division |
| Petitioner-Appellant/Cross-Appellee, | ) | |
| | ) | No. 11 D 5706 |
| and | ) | |
| | ) | |
| RICHARD EHRIE, | ) | Honorable |
| | ) | Mary S. Trew, |
| Respondent-Appellee/Cross- | ) | Judge, presiding. |
| Appellant. | ) | |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's judgment against petitioner finding that she was not entitled to the proceeds of respondent's restrictive covenant agreement was against the manifest weight of the evidence. The trial court's judgment that petitioner was entitled to the proceeds of respondent's consulting agreement was also against the manifest weight of the evidence.

¶ 2                                    I. BACKGROUND

¶ 3    This case stems from post-judgment dissolution of marriage proceedings between petitioner-appellant/cross-appellee Lisa Mulligan-Ehrie and respondent-appellee/cross-appellant, Richard Ehrie. Lisa sought declaratory relief regarding her entitlement to sums received by Richard pursuant to agreements executed in connection with the sale of a marital business. Following a seven-day trial, the trial court determined that Lisa was entitled to 33% of the sums received under a consulting agreement, but was not entitled to the sums received pursuant to a restrictive covenant agreement. Lisa appeals from that judgment, arguing that the trial court erred in finding that she was not entitled to any of the proceeds of the restrictive covenant agreement. On cross-appeal, Richard argues that the trial court improperly found that Lisa was entitled to 33% of the proceeds of his consulting agreement. For the reasons that follow, we reverse both determinations of the trial court, and remand for further proceedings in accordance with this disposition.

¶ 4                        A. The Parties' Divorce Proceedings

¶ 5    Lisa Mulligan (formerly Lisa Mulligan-Ehrie) and Richard Ehrie were Illinois residents who had been married in Dallas, Texas in 1985, and later moved to Illinois. The parties had two children, who were over the age of 18 at the time the divorce proceedings were commenced.

¶ 6    In 2000, Richard, along with two other partners unrelated to this appeal, formed and operated three business entities: Advertising Resources, Inc., an Illinois corporation; Advertising Resources VA Inc., a Virginia corporation; and Advertising Resources CA, Inc., a California corporation (collectively, ARI). ARI provided contract packaging, fulfillment, materials procurement, and project management services for consumer packaged good companies.

¶ 7    In 2009, the parties separated. On June 6, 2011, Lisa filed a petition for dissolution of marriage pursuant to the Illinois Marriage and Dissolution of Marriage Act, 750 ILCS 5/101, *et*

*seq.* (West 2010), in the circuit court of Cook County, and the petition was amended on January 23, 2012. The petition alleged that Richard was presently employed as the founder and president of ARI, and that the couple had acquired certain property, including the business, during the course of their marriage. Lisa also alleged that she lacked sufficient income to provide for her own reasonable needs following the end of the marriage. On July 13, 2011, Richard filed a counter-petition for dissolution of marriage, and denied that Lisa needed temporary or permanent maintenance.

¶ 8     The matter continued to discovery, pursuant to which Lisa requested a valuation for ARI.[1] At the time of divorce, Richard owned approximately 41.77% interest in ARI.

¶ 9                                  1. The Marital Settlement Agreement

¶ 10    On December 16, 2013, the parties entered into a marriage settlement agreement (MSA).[2] Both parties were represented by counsel other than those representing them in the immediate divorce proceedings. Specifically, Lisa hired William Holzman, and Richard hired Suzanne Saxman, who had previously represented ARI in other unrelated matters.

¶ 11    The MSA addressed various financial matters, including but not limited to spousal maintenance and the division of Richard's interest in ARI. Section 2.1 of the MSA provided for the amount and duration of maintenance payments to be paid by Richard to Lisa, beginning on December 15, 2013 and continuing through December 15, 2020 (the initial maintenance period). Richard was to pay Lisa monthly maintenance in the amount of $24,167.[3] Pursuant to section 2.3

---

[1] According to testimony derived later at trial, ARI was evaluated by Lisa at the time of the divorce proceedings, but Richard did not agree with the valuation. However, the record does not contain any formal valuation of the company at the time of its later sale.

[2] Richard withdrew his counter-petition pursuant to the MSA.

[3] Richard's annual income was identified as $1,113,988 in 2012, while Lisa's gross income was recorded as $3,073.

of the MSA, the initial maintenance period would terminate under a variety of circumstances, which included, among others, the provisions of Section 2.5 of the MSA or by order of court.

¶ 12    Section 2.5 of the MSA, "Review of Maintenance After Initial Period," provided for a review period of the initial maintenance period, either by December 15, 2020, or upon the sale of ARI pursuant to section 3.8 of the MSA. Specifically, on or before September 15, 2020, or within 60 days following the sale of ARI, whichever was to come first, Lisa was to file a motion requesting a continuation of maintenance if she so wished. Subsequently, the trial court would determine if Lisa's maintenance should be extended, and if so, her new monthly payments and their duration.

¶ 13    Section 3.8 of the MSA governed Richard's current business interests in ARI, which was currently held in his name and was considered common stock. The parties agreed that "Lisa shall be entitled to a *** 33% interest of Richard's interest in ARI" and that the parties had contemporaneously entered into separate agreements that would "detail[] how and when Lisa will be compensated for her interest in ARI."

¶ 14                2. The Share Agreement and Voting Trust Agreement

¶ 15    Pursuant to the MSA, Lisa and Richard contemporaneously entered into a Voting Trust Agreement (VTA) and Share Agreement on December 16, 2013. The Share Agreement expressly provided that "[a]s part of the property settlement between Lisa and Richard in their divorce proceeding, they have agreed that Lisa will have certain rights to the Shares." Richard was to hold a beneficial interest in 67% of his current shares, and Lisa would have a beneficial interest of 33% of that interest.

¶ 16    The Share Agreement further appointed Richard as Trustee of the Shares, to be memorialized in the VTA, with the Shares to be deposited into a "Voting Trust." Pursuant to

section 4, Richard was to provide Lisa with annual balance sheets, income statements, federal tax returns, and other documentation related to ARI's operations, financial statements, and prospects, as well as to answer any questions related to the businesses.

¶ 17    In the event of a sale transaction, section 6 of the Share Agreement provided that Lisa would be entitled to 33% of the "Net Proceeds" relating to the sale of ARI. "Net Proceeds" are defined as:

> "The total proceeds and other consideration actually received by the Trustee of the Shares in connection with a Transaction, net of all reasonable fees and expenses of the Transaction which are borne by [ARI]'s shareholders. Net Proceeds will include cash, notes, securities, retained cash and retained accounts receivable of [ARI], and other property or amounts payable in the Transaction as deferred or contingent purchase price, including any earnout, payment for Richard's personal goodwill, non-competition payments made to the Shareholders of the Corporation generally, or other contingent payments based on the occurrence of future events. Net Proceeds will also include any proceeds and other consideration otherwise payable to the equity owners of the Corporation, generally, as a result of such ownership which are paid to Richard by such persons pursuant to any understanding or arrangement. Net Proceeds will not include any reasonable amounts payable in connection with bona fide personal services to be performed by Richard after the closing of the Transaction under a consulting or employment agreement, or under any employee benefit plan. The parties acknowledge that any Transaction amounts placed in escrow by the purchaser of the Corporation will not be included in Net Proceeds until actually received."

¶ 18    Section 7 of the Share Agreement required Richard to provide prompt notice to Lisa following the approval of any sale of ARI, complete with letters of intent and "definitive documentation" regarding the sale. Finally, section 9 of the Share Agreement prohibited Richard from taking any action, or causing ARI to take any action, "that could reasonably be expected to adversely affect the rights of Lisa" under this agreement or the VTA.

¶ 19    Lisa and Richard also entered into the VTA on the same day, which expressly noted that the "Share Agreement between the Shareholders *** [was] in full force and effect[,] and control[ed] the ownership and disposition of Lisa's beneficial interest in the Shares." The VTA indicated that Richard and Lisa "ha[d] agreed to grant Richard, as Trustee, the voting power and title to the Shares" in "all matters relating to" ARI, thus designating him as fiduciary of the Shares. The VTA was in effect for an initial term of 10 years, provided that, among other events, ARI had "not yet been sold to a bona fide, unrelated third party."

¶ 20    Following the execution of both documents, Richard retained 27.99% in ARI; Gary McCullough, another ARI shareholder and the company's chief executive officer, retained 29.21%; Michael Banks, a shareholder and former employee of ARI, at 29.02%; and Lisa, at 13.78%.

¶ 21                                    B. The Sale of ARI

¶ 22    On June 23, 2017, ARI received a "Letter of Intent" ("LOI") from Menasha Corporation to purchase ARI for $31 million. The LOI also indicated that Menasha would enter into consulting agreements with Gary and Richard to consult on a full-time basis for five years after the sale of ARI, specifically with regard to "the integration of ARI, developing customer relationships *** [and] contract packaging capabilities," and "identifying contract packaging growth opportunities." The "Consulting Agreements [would] contain restrictive covenants to be mutually agreed," and

Richard and Gary would be paid an aggregate amount of $3,600,00.00, payable in monthly increments of $60,000.00, with "allocation *** between [Richard and Gary] *** to be determined." Gary and Richard would be bound by restrictive covenants for a period of five years, in exchange for an aggregate amount of $5,400,000.00 payable in monthly installments of $90,000.00, with the allocation between Richard and Gary to be determined. The LOI laid out a proposed timeline of events to finalize the sale, with a projected closing date of August 31, 2017. Richard signed the LOI as on behalf of ARI on June 23, 2017.

¶ 23   On September 6, 2017, Menasha and ARI entered into an "Agreement and Plan of Merger" (the merger agreement) wherein Menasha agreed to purchase ARI for the "base price" of $31 million. Menasha also agreed to pay Richard and Gary pursuant to "Consulting Agreements" to be defined in separate agreements. A portion of the proceeds was to be held in an escrow account, to be disbursed 18 months and 36 months after the sale.

¶ 24   That same day, Richard, Lisa, Gary, and Michael Banks executed a "Stockholder Agreement," which provided that they had agreed to sell ARI to Menasha Packaging Company, LLC pursuant to the merger agreement. The Stockholder Agreement also provided that Richard and Gary were subject to "certain liabilities" associated with the sale.

¶ 25   Richard and Gary executed separate "Restrictive Covenant Agreements" (RCA) that same day. The RCA provided that Richard had been in a "management position" with ARI, and had "considerable experience with the [c]ompanies," and "possesse[d] valuable information and knowledge about the [c]ompanies and their business affairs." Thus, "in accordance with the terms *** of the [m]erger [a]greement, and other good and valuable consideration," Richard and any of his designated "seller affiliates" agreed to be bound by a restrictive covenant for a period of five years in which he was prohibited, as an "employee, agent, partner, officer, principal, director,

shareholder, consultant, or lender," to compete with Menasha/ARI. However, Richard was allowed to become a "passive owner of not more than 5% of outstanding stock of a corporation which is publicly traded," so long as he did not have "active participation in the business of such corporation." In exchange, Richard was to be paid $3,780,000.00, divided into 60 monthly payments, beginning on September 30, 2017.

¶ 26    Richard also entered into a Consulting Agreement with ARI/Menasha on September 6, 2017, which indicated that Menasha intended to "continue and expand the business *** conducted by ARI." The Consulting Agreement identified Richard as a "consultant" and reiterated his experience and knowledge about ARI and its business affairs. As such, Richard was retained "to receive the benefit of his knowledge and experience" through consulting services as an independent contractor.

¶ 27    Pursuant to the Consulting Agreement, Richard was required to "consult in person or by telephone" with regard to ARI's business operations on a non-exclusive, "as-needed basis, at mutually agreeable times at the request of any officer of ARI or any other authorized individual." The Consulting Agreement was to last for five years, in which Richard would receive compensation of $2,520,000.00, payable in 60 monthly installments beginning on September 30, 2017. Menasha/ARI was to reimburse Richard for any "reasonable, documented, out-of-pocket expenses" incurred as a  result of any such service. Section 3(c) also provided that in the event of Richard's death, any remaining payment would be paid as a death benefit to his estate or to his designated beneficiary, either monthly or by lump sum. Finally, section 2 provided that the agreement could be terminated by ARI if Richard was found to have violated the RCA, to be pursued by a "court action" relating to the alleged breach which would result in a "final, non-appealable judgment."

¶ 28                                    C. Trial Court Proceedings

¶ 29                          1. Lisa's Petition for Continued Maintenance

¶ 30    On October 31, 2017, Lisa filed a Petition to review and extend Richard's obligation to pay maintenance. The Petition detailed the timeline of the sale of ARI, and that Richard had entered into the Consulting Agreement and RCA, which resulted in $105,000.00 in monthly gross income. Lisa alleged that, at the time of execution of the MSA and Share Agreement, the parties had not contemplated that Richard's RCA and Consulting Agreement payments would be solely designated for his benefit, the proceeds from which Lisa alleged she too was entitled to receive.

¶ 31    On December 7, 2017, Richard filed a response to the Petition, arguing, *inter alia*, that the Consulting Agreement and RCA did not apply to her.

¶ 32                          2. Lisa's Declaratory Judgment Action

¶ 33    On August 13, 2018, Lisa filed a "Petition for Declaratory Judgment and to Enforce Judgment for Dissolution of Marriage." Therein, Lisa alleged generally that Richard had, in violation of his fiduciary duties outlined in the VTA, failed to provide her with relevant information relating to the sale of ARI, and entered into agreements that prevented her from sharing in the total benefits of the sale as contemplated by the MSA and Share Agreement.

¶ 34    Count I alleged that section 6 of the Share Agreement entitled Lisa to the proceeds of the RCA because such payments were "net proceeds" as both: (a) "contingent payments based on the occurrence of future events subsequent to the sale of ARI, namely his non-competition with ARI, *** Menasha, and their affiliate"; and (b) non-competition payments, where two of the three shareholders in ARI had received non-competition agreements. Count II alleged that Lisa was also entitled to Richard's Consulting Agreement payments because they constituted "net proceeds" as: (a) "contingent payments based on the occurrence of future events subsequent to the sale of ARI,

namely [Richard's] compliance with the [RCA]"; and (b) the Consulting Agreement did not qualify as a "bona fide personal services agreement," which would otherwise qualify as an exception to section 6.

¶ 35    On November 1, 2018, Lisa filed a memorandum of law in support of her declaratory action. Lisa argued that she was entitled to 33% of the proceeds from Richard's Consulting Agreement and RCA, and that by executing these agreements, Richard had nefariously "negotiated for himself as a diversion of the sales price of their marital business." Lisa argued that the "unmistakable purpose of the Share Agreement [had been] to protect Lisa" from "Richard's self-dealing and to ensure that Lisa would receive the full value of her shares of stock[.]"

¶ 36    Relevant here, Lisa argued that section 6 of the Share Agreement broadly defined "net proceeds." With regard to the provision accounting for "non-competition payments made to shareholders of the corporation generally," Lisa argued that the "most sensible definition" of the word "generally" was "in most cases," "usually," or "for the most part." Lisa asserted that because two of three ARI shareholders had received "non-competes," the RCA payments had been made to the shareholders "generally" and thus were "net proceeds." With regard to the Consulting Agreement, Lisa argued that the agreement was "illusory" because such payments were not reasonable in amount and were not made in good faith or in receipt of genuine personal services. Finally, Lisa argued that if the court were to find section 6's language to be ambiguous, the court "should hear extrinsic evidence regarding the interpretation of the Share Agreement."

¶ 37    Richard also filed a memorandum of law in response to Lisa's declaratory action. Richard argued that both the RCA and Consulting Agreements were excluded from "net proceeds," that the Share Agreement was "clear and unambiguous," and thus there was "no legal basis" for the court to "consider parol evidence." As to the RCA, Richard agreed that it was a non-competition

agreement, but that it had not been offered to all of the ARI shareholders and was based on Richard's position as manager in ARI. As to the Consulting Agreement, Richard contended that the agreement was genuine and only required his services on an "as needed" basis.

¶ 38    The trial court held argument[4] and on December 20, 2018, issued a Memorandum Opinion and Order. The court granted Lisa's declaratory action in part and denied it in part. The trial court agreed with Lisa's interpretation of the RCA and granted judgment in her favor, thus ordering Richard to pay 33% of his monthly income from the RCA, retroactive to September 6, 2017. However, as to the Consulting Agreement, the court found that it could not "determine purely based on the four corners of the Share Agreement, whether or not the proceeds flowing from the alleged Consulting Agreement are to be considered [n]et [p]roceeds or to be excluded from the same." As such, the court denied judgment for Lisa on that basis.

¶ 39    On January 17, 2019, Richard filed a Motion to Reconsider, the crux of which concerned the trial court's interpretation of the term "generally" with regard to section 6's "non-competition" provision. On April 9, 2019, the trial court granted Richard's motion on that basis, entering a written order that it had "erred in its application of the law." As such, the trial court denied Lisa's declaratory judgment action in its entirety and set the matter for trial on both the declaratory action and Lisa's petition for continued maintenance.

¶ 40                                  3. Trial[5]

---

[4] The record does not contain a transcript of this proceeding.

[5] The parties entered into a series of trial stipulations, including that from Patrick Blaney, a representative of Menasha Corporation and its subsidiary, Menasha Packaging Co., LLC, who if called, would testify that, *inter alia*: (1) Richard had spoken with a Menasha employee, Gail Constacio, once or twice regarding the integration of systems from ARI to Menasha, that Richard's services had not been "incredibly helpful," and she did not contact him further; (2) Richard communicated somewhat frequently with Michael Santucci, an employee at Menasha Packaging, Co., on matters which were both personal and professional in nature; (3) no other relevant Menasha employee had communicated with Richard since the

¶ 41    On April 29, 2019, the case proceeded to a seven-day bench trial. The following is a representative summary of the testimony.[6]

¶ 42                                        a. Lisa's Testimony[7]

¶ 43    Lisa testified that in 2000, Richard founded ARI with Michael Banks and Warren Watson, who both retained stock in the company. At some point, Watson left the business and sold his interest, and Gary McCullough joined as CEO and accumulated shares. Later, Michael Banks was fired, but retained his shares in ARI. Lisa was told that Michael did not receive a non-compete or a consulting agreement in the sale of ARI.

¶ 44    During the divorce proceedings, Lisa conducted a forensic appraisal of ARI, but Richard did not agree with the valuation. In 2014, Lisa requested Richard provide her with various financial documents regarding ARI. Richard did not give her those documents, but began to provide her with updates about the business over the phone on an "as needed basis," but at least annually.

¶ 45    Lisa and Richard discussed the value of ARI when he called her to give her an update in either late February or March 2017. Richard indicated that the business was doing well, and

_____

acquisition of ARI with regard to consulting services; and (4) Menasha did not have a written policy of consultants being only authorized to speak to certain individuals at the company.

     Other stipulations included submission of, *inter alia*, the parties' financial account statements, various ARI and Menasha documentation, including drafts of later finalized agreements, and emails and text messages between Lisa and Richard, as well as their attorneys and co-workers at ARI prior to acquisition.

     [6] The testimony summarized herein is based on the chronological order in which the witnesses were presented. We specify this because the record reflects a somewhat confusing sequence of events, in which multiple witnesses were called out of order, testimony ended and resumed on non-consecutive days, individuals were designated as witnesses for both parties, and some were re-called as rebuttal witnesses. Additionally, the trial included particularized testimony as to Lisa's petition for maintenance. Finally, the testimony is extensive. We have culled through the record and have attempted to recite only that testimony which we deem relevant to a complete understanding and resolution of the issues on appeal.

     [7] Lisa was first called as a fact witness for her own case in chief. She was then called as a rebuttal witness for Richard's case in chief.

believed its current value was between $41 and $46 million. He did not tell her that there currently was an offer on the table to purchase the business, or that he had received a communication from a prospective buyer.

¶ 46    In April 2017, Lisa discovered that Richard was considering a sale. In June 2017, Lisa contacted Richard to inform him that she wanted to be fully apprised of any ongoing sale negotiations. The two continued to talk via text message and phone calls, in which Richard stated that he had received an offer for the business, estimated to be around $31 million. Lisa considered the offer to be a "low-ball," because it was a $10 million difference from what Richard had told her previously with regard to the value of the business. Richard said he was "happy with the deal." Richard told her that ARI had "received a definitive agreement from Menasha," were conducting due diligence, and that any details about the transaction were confidential and only available to ARI's board of directors. However, he informed her that he and Gary would have to sign non-competition and consulting agreements, which were still being negotiated. Lisa continued to request updates on the transaction.

¶ 47    On August 18, 2017, Richard emailed Lisa some documentation pertaining to the sale. Lisa responded that she "felt really in the dark." Richard stated that he had "nothing in writing yet" and referred her to Saxman, ARI's legal counsel for the sale of ARI. Lisa subsequently retained Holzman, her previous attorney for the VTA and Share Agreements, to communicate with Saxman on her behalf.

¶ 48    On August 24, 2017, Richard provided Lisa with further documents, but she "did not really understand what he was providing to [her.]" The documents referenced "consulting proceeds," but did not discuss money being paid in relation to a non-competition agreement. Lisa testified that Holzman attempted to obtain copies of ARI's financials "several times," including the sale's

acquisition and consulting agreements. Instead, Saxman provided him with basic terms of the consulting agreement of "5 years, $504,000.00 per annum" which would total about $2.52 million.

¶ 49    On August 29, 2017, Saxman requested Lisa's signature on the Stockholder Agreement to facilitate the merger agreement. Holzman responded that Lisa would not sign until she received the outstanding sale documents, to which Saxman stated that they still had not been finalized. As such, Lisa signed a signature page of the Stockholder Agreement that, presumably, would reserve her rights after closing.

¶ 50    On cross-examination, Lisa testified that she received the final versions of the Consulting Agreement and RCA the day before the closing on September 6, 2017. Lisa did not believe she could object, and she and Holzman were "not able to go over everything" before the sale closed.

¶ 51    On redirect examination, in response to whether she thought she had any choice with respect to signing the Stockholder Agreement the day before the closing, Lisa testified that "they needed [her] signature" in order to close, and that Saxman "indicated to [Holzman] and myself that we could handle the issues that Richard and [she] had with regard to the divorce and agreements, at a later date." Lisa testified that Saxman also acknowledged in emails to her and Holzman that Lisa had "reserved her rights" under the VTA and Share Agreement.

¶ 52                                  b. Philip Katzberg[8]

¶ 53    Katzberg testified on direct examination by Richard's counsel that he was a certified public accountant and certified valuation analyst, and worked at Bronswick Benjamin. ARI had been Bronswick Benjamin's client for about 16 or 17 years, and had prepared final tax returns for the ARI entities leading up to the sale. Katzberg testified that Richard's payments under the Consulting

---

[8] Katzberg testified for both parties as an independent occurrence witness and as an expert witness. He was first called by Richard's counsel. The parties stipulated that he was an expert in tax accounting.

Agreement were "treated as ordinary income," which was taxed as a "self-employment tax." The RCA payments were not taxed the same and were only subject to the ordinary tax rate. On cross-examination, Katzberg testified that he was not involved in the negotiations between the two companies, and was not aware of the exact terms discussed between the parties.

¶ 54                           c. Lawrence Reents

¶ 55    Reents testified that he had initially been hired as a consultant for ARI, and then became its chief financial officer in December 2014. Reents worked closely with Richard and was responsible for accounting, financial planning and analysis, business process and improvements, information technology, and inventory control. Reents was not on the board of directors but was privy to the sales negotiations between ARI and Menasha.

¶ 56    Reents learned of the merger between ARI and Menasha in April or May 2017, as ARI provided financial statements to Menasha in May 2017. On June 6 or 7, 2017, a meeting took place between himself, Richard, Gary, and various Menasha representatives to discuss a potential sale or merger. Reents believed Menasha had initiated the conversation to discuss the appropriate valuation for ARI, and although ARI valued itself at $40 million, ARI had not performed any formal valuations at that time. ARI and Menasha were "ways apart on initial conversations," with Menasha first proposing between $30 to $33 million. However, there was a "handshake agreement" between the parties as to the "combination of stock value and other considerations." By June 2017, the parties were "discussing different permutations of purchase price and side agreements" with an agreement that "$9 million would be paid out as part of the sale for the service and restrictive covenants," but there was no such agreement as to how it would be paid.

¶ 57    On cross-examination, Reents testified that the amount of the stock purchase price never changed during the negotiation process, nor did the amounts offered for the RCA and consulting

agreements. Reents was not aware of how the proceeds of the RCA and Consulting Agreement proceeds were divided between Richard and Gary.

### d. Patrick Dolan

¶ 58    Dolan was qualified as an expert witness and testified on behalf of Lisa that he was an employment law attorney, specializing in contract negotiation and drafting, including consulting, compensation, and restrictive covenant agreements. He had been asked to determine whether Richard's Consulting Agreement was "typical of consulting agreements [he] was aware of." He reviewed the Consulting Agreement, as well as Menasha's LOI and the RCA, and drafted a report entitled "Expert Witness Report Regarding Consulting Agreement." He did not rely on any other facts or documents when rendering his report, but later stated on cross-examination that he had read email communications between the parties when such agreements were being negotiated.

¶ 59    Dolan testified that the Consulting Agreement was "not typical" and "inconsistent" with other consulting agreements. The agreement failed to include Richard's scope of work, which was typical to have "so both the company and consultant know what is expected of them." There were no provisions connecting Richard's monthly compensation to the accomplishment of certain tasks or goals, which was "highly unusual." Next, the duration of the agreement was five years, with typical agreements usually lasting between one to two. He also found it "unusual" that the agreement could only be terminated if a court found that there was a breach of the RCA, an entirely separate agreement, as opposed to Richard failing to provide a requested service emanating from the Consulting Agreement. Dolan also pointed out that there was no invoicing or billing requirement for payment, which would typically include rates of pay, hours spent working, and itemized details and services provided. There were also no provisions that stated that the consultant was responsible for all taxes and insurance. Dolan also found the agreement's provision to keep

paying Richard's beneficiary in the event of his death to be "highly unusual" and something he had not seen before.

¶ 60    On cross-examination, Dolan admitted that he had never before been hired to give expert witness testimony. He characterized the Consulting Agreement as "atypical." He stated that he also read the Share Agreement, but it did not affect his opinion. He did not review any closing documents for the sale of ARI, and offered no opinion as to whether bona fide consulting services had actually been provided, or whether the payments to Richard were reasonable. Dolan was aware that Richard had been in a management position at ARI, but this did not impact his opinion. When asked if all items identified in his report were necessary for an agreement to be "typical," he answered that he "see[s] all of them in typical consulting agreements."

¶ 61                                  e. Richard[9]

¶ 62    Richard was first called to testify as an adverse witness in Lisa's case in chief.  He testified that "sometime in 2017" the board of directors of ARI began negotiating for the sale of ARI, with Menasha coming to discuss a sale at the end of March or beginning of April 2017. The proposal for sale came as an "unsolicited third-party offer," with the official offer coming in June 2017. Richard denied that Menasha offered $33 million for ARI and that there had been "no negotiation with Menasha" prior to the LOI being issued.

¶ 63    Richard denied telling Lisa that the business was worth between $41 and $46 million, but it was his opinion of what ARI was worth at the time. Richard denied telling Lisa that he was "shopping the business" and testified that he did not tell her about conversations with Menasha because he was "operating as an officer of the corporation, on the board of directors" and "that's

_____

[9] As we recite later, Richard was subsequently called as a fact witness on his own behalf.

where [his] fiduciary responsibility lay." Richard testified that "at some point" following negotiations, ARI agreed to a purchase price of $31 million, with $9 million in ancillary agreements, which led to Menasha drafting the LOI. When asked who determined the allocation of money between Gary and him with regard to the additional agreements, he responded that he did not know, but knew that Menasha gave them "guideline principles" but did not tell them how to split the proceeds.

¶ 64    Richard was unsure if he told Lisa he was getting $9 million of benefits in the sale. He did not tell her ARI had signed a LOI on June 23, 2017. He believed he told her about the ancillary agreements in phone conversations and emails, but did not have evidence of that. He told Lisa about the salient terms of the sale on August 4, 2017. As to the non-competition agreement, Richard testified that he told Lisa he was signing one but did not tell her how much he was receiving. Per its terms, Richard is "not allowed to go out and work" and cannot not hire employees from ARI. As to the consulting agreement, Richard testified that Menasha had "recourse if [he] didn't do what [he was] supposed to do." On redirect examination, Richard appeared to contradict himself by stating that the meeting between Menasha and him occurred in May 2017, not June as he had originally stated.[10]

¶ 65    On direct examination in his own case-in-chief, Richard testified that he was currently employed as a consultant for a company called "Oakway," and works for Menasha pursuant to the Consulting Agreement. He started Oakway so he could "put money away pretax" from his agreements with Menasha.

---

[10] At the close of Lisa's case in chief, Richard made a motion for directed finding as to Count I of Lisa's declaratory judgment. The trial court reserved its ruling but ultimately denied the motion on July 22, 2019.

¶ 66    Richard testified that in March or early April 2017, ARI received notice that Kraft, one of their major clients, had awarded their contract to Menasha. The meeting between ARI and Menasha "turned into something we hadn't anticipated" when Menasha stated that it wanted to buy the business. Menasha offered $31 million dollars for the business during the June meeting, and indicated that they also wanted Gary and Richard to sign non-competition agreements valued at $9 million. Richard tried to negotiate the price, but Menasha "would not budge." Richard "did not ask" for either the RCA or Consulting Agreement.

¶ 67    Richard testified that he and Gary decided to split up the $9 million based on their annual salaries, where in 2016, Richard's was $1.5 million and Gary's was $500,000.00. Richard was questioned by the court as to whether he had an option to reject either agreement, and Richard responded that he could not because Menasha had been "quite clear in the fact that the structure would be a sale price, *** contingent on Gary and [himself] signing a non-compete." Richard had not been aware that this would result in two separate agreements until Menasha sent over the first drafts.

¶ 68    Richard began consulting for Menasha right after the sale, specifically in Alsip, the main headquarters of ARI. Richard did not remember who had asked him to come in, but the issue concerned pricing and resulted in two to three meetings and a number of phone calls. Richard testified that he still consults for Menasha now, "primarily *** on the operational side," with Michael Santucci. Richard indicated that he and Santucci talk once or twice a month over the phone, that Richard conducts research for him regarding specific projects, and that he advises Santucci and meets with him socially. Richard has never refused to consult and never turned down a request to do so, nor missed a requested meeting. He also receives phone calls while he travels,

as he is out of the country frequently. He is not required to keep records of his time, nor required to submit them.

¶ 69    On cross-examination by Lisa's counsel, Richard denied that Menasha had offered them $33 million in the June meeting, and only that each party "had an agreement on a price that [each] would take back" to their businesses. ARI had discussed presenting a counter-offer to Menasha, but he did not know the details of the negotiation, as most of the negotiations were handled by Reents and Gary.

¶ 70    As to his current work, Richard admitted that there were "some months" where he did not do any consulting, but he had to "keep current on what's going on in the marketplace" and "talks to somebody" every month. When asked by the court if his consulting agreement did not require him to complete specific projects, Richard agreed and said that he "never really looked at the contract" and that he "relied on [his] attorneys." He indicated that he conducted research on trade journals online between 10 and 20 hours a month, and would "go to vendors" for further research. Richard testified that Santucci was the director of engineering at the Alsip facility, and that he was Santucci's mentor. Neither Santucci nor Menasha had ever asked Richard to work with customers.

¶ 71    On redirect examination, Richard testified that ARI had four plants, and that he designed and engineered every production line. As to Santucci, Richard indicated that he consulted with him regarding plant layouts. Richard also testified that he talked to Gail Constacio, a Menasha employee, over the phone after the sale.

¶ 72                                    f. Suzanne Saxman[11]

---

[11] Saxman was identified as an adverse witness by Lisa, and as an independent expert and occurrence witness by Richard. Richard called her as a witness first.

¶ 73    Saxman was admitted by the court as an expert in mergers and acquisition (M&A), including restrictive covenants. On direct examination by Richard's counsel, Saxman testified that she was a corporate attorney with Seyfarth and Shaw, and had been in practice for 38 years. Saxman led the firm's M&A practice, and typically closed 10 transactions a year. Saxman testified that most M&A transactions included non-competition and consulting agreements "almost 100% of the time." RCAs are included in virtually every transaction because "buyers [don't] want the people who are the greatest competitive threat to impede the business they bought" as it would "devalue the investment they just made."

¶ 74    Saxman was familiar with the VTA and Share Agreement, as Richard had sought her counsel in finalizing those agreements. She was also familiar with Holzman, who she had met years prior working on an unrelated transaction, and they worked on the VTA and Share Agreement together. Saxman testified that the purpose of the Share Agreement had been to divide the shares of which Richard was an owner. Her office had prepared the draft, Holzman reviewed, and the draft went through a "couple changes." Holzman and Saxman never met in person, but discussed terms over the phone at least once. Saxman testified that when the Share Agreement was drafted, they did not know what type of transaction ARI would enter into or how it would be structured, so they wanted to do a "broad brush of things."

¶ 75    Saxman was directed to section 6 of the Share Agreement. When asked what the provision "amounts payable in the transaction as to deferred contingent purchase price" meant, she answered that it was an "earn out" or "contingent portion of the purchase price that is based upon as to current future [events]" that would depend on the "performance of the company, or the happening of certain specific identified events." If there was a type of deferred payment, promissory note, or contingent payment based on an event that would occur post-closing, this phrase was "intended to

be captured as purchase price" and that "everybody would share in that." When asked if the ARI sale included a "deferred purchase price," Saxman said "not technically," but that "there were funds that [had been] escrowed" to ensure for any warranties or post-closing covenants that could be potentially breached in order for Menasha to make a claim against.

¶ 76    When asked about the phrase "non-competition payments made to the shareholders generally," Saxman testified that originally, Holzman wanted any non-competition agreement to qualify as a "net proceed." Saxman testified that non-competition agreements may sometimes only be given to certain specific individuals, as some shareholders were not competitive threats. She intended that phrase to apply to all shareholders.

¶ 77    When asked about the phrase "other contingent payments based on the occurrence of future events," Saxman testified that this provision meant to address a situation where the company would gain a new customer during negotiation of the sale of the business. The phrase was meant to be tied to a "company event" or its financial performance that might factor into the purchase price. Saxman did not intend for this phrase to apply to shareholders.

¶ 78    When asked about the phrase "proceeds of other consideration, otherwise payable to the equity owners of the corporation generally as a result of such ownership, *** paid pursuant to any understanding or arrangement," Saxman testified that this phrase was meant to cover payments that were directed to all shareholders as a group, such as a payment for intellectual property.

¶ 79    In June 2017, Saxman became aware of a pending ARI sale. She was sent a LOI in mid or late June, and that there was "a lot of due diligence being done quickly." Menasha drafted the initial versions of the RCA and Consulting Agreement, and Saxman negotiated further provisions.

¶ 80    With regard to the RCA, Saxman testified that its duration of five years or more is "pretty standard" so long as it was in connection to the merger agreement. As to the Consulting

Agreement, Saxman testified that the length of such agreements depends on the "variables" and in this instance, it "coincide[d] with the RCA." With regard to the lack of detail in the agreement, Saxman testified that specific tasks are not usually defined in connection with M&A agreements because "usually the buyer wants certain individuals to be on call for anything" and that "sometimes they are specific, but not all of the time." When asked if such agreements usually contain periodic reporting obligations for the consultant, Saxman answered "not necessarily" and for ARI, it was not required because the parties did not yet know the services they would need. Instead, the agreement was a general overview of what the relationship would be. Saxman also negotiated the terms regarding payments going to Richard's beneficiaries in the event of his death as she wanted to make sure that he and Gary would not lose their benefits. Saxman did not send Holzman drafts of the RCA or the Consulting Agreements until the drafts were "far enough along that we felt that they were acceptable."

¶ 81    On cross-examination, Saxman testified that not all M&A transactions include consulting agreements, but "virtually 100%" will have non-competition agreements. As to the phrase "non-competition payments made to the shareholders of the corporation generally," Saxman agreed that the word "all" was not included in that phrase but did appear in other provisions in section 6. However, it was her intention for the word "generally" to mean "all shareholders." When asked why she did not use the word "all," Saxman stated that "there are more ways to say some things" and that she "used a different word." She did not rely on a legal treatise or authoritative document to come to this conclusion, but "it[] was in the dictionary." As to the phrase "contingent payments," she reiterated that those payments would be directed towards the corporation, not the shareholders, but it could "possibly" apply to them.

¶ 82    On redirect examination, Saxman testified that she viewed the word "equity owner" as contained in section 6 to be synonymous with "shareholder." On recross examination, when asked why section 6 used the word "equity owner" instead of "shareholder," Saxman testified that Holzman had added that term. Saxman added the word "generally" to the non-competition provision and did not feel that she and Holzman "ha[d] a disagreement on [that]."

¶ 83                                    g. William Holzman[12]

¶ 84    Holzman testified that he was an attorney who practiced in general corporate matters, such as M&A, finance, private securities transactions, and real estate leases. He first represented Lisa in connection with negotiating the Share and VTA Agreements.

¶ 85    Holzman testified that he received "redlined" versions of the Share and VTA Agreements, and "left as much alone as could be" and was "reasonable under the circumstances." Holzman and Saxman did not meet in person for these negotiations, did not discuss the terms of the agreement, and spoke on the phone two or three times. Any discussions were about "procedural matters" such as when the next draft would be available.

¶ 86    When asked about the phrase "payment for Richard's personal goodwill" and "non-competition payments made to shareholders of the corporation generally," Holzman indicated that he understood the term "generally" to mean "if more often than not," "usually," or "majority." If less than a majority of the shareholders received non-competition payments in connection with the sale of ARI, he interpreted that as such payments would not be included within "net proceeds." If a majority or more did receive such payments, then it would fall within "net proceeds."

---

[12] Holzman testified as a rebuttal and occurrence witness for Lisa.

¶ 87    When asked about the phrase "other payments contingent on the occurrence of future events," Holzman interpreted that as a "catchall phrase" as the rest of section 6 was very detailed. When asked what an "earn-out" was, Holzman testified that it was a portion of the purchase price in a merger transaction in which the buyer makes certain payments usually based on future revenues of the company. When asked if the phrase "contingent payments" was meant to capture "earnout" payments," Holzman testified that earnout payments "[fell] into the category of a future contingent payment," but that the word "earnout" had already appeared prior in the paragraph. "Future events" could also be interpreted as both a "company event" or a future event affecting a shareholder.

¶ 88    Holzman added the phrase "net proceeds will also include any proceeds and consideration otherwise payable to the other equity owners of the corporation, as a result of such ownership which are paid to Richard by such persons pursuant to any understanding or agreement." He intended to make the definition of "net proceeds" as "inclusive as possible under the circumstances," and this provision could apply to a situation where a minority shareholder received a payment, to be paid to Richard thereafter.

¶ 89    Holzman also made changes to section 6's "personal services" exception. He believed the original provision was "too inclusive" and wanted to limit those payments to "reasonable amounts." He also added the phrase "bona fide" to ensure that there was a good faith consulting agreement in place.

¶ 90    Holzman testified that Saxman's edits to the draft overall included the words "generally" and deletion of the word "other" with regard to the phrase "any proceeds and other consideration otherwise payable to the equity owners of the corporation." Saxman and Holzman never discussed

the meaning of the term "generally." Saxman also edited section 8 of the Share Agreement, where she added the phrase "equity owners of the corporation."

¶ 91    On cross-examination by Richard's counsel, Holzman testified that he and Saxman did not discuss the phrase "other contingent payments based on the occurrence of future events." He did not believe that a deferred or contingent payment was synonymous with "non-competition payments made to shareholders generally" as non-competition payments were usually not "deferred" or "contingent." Holzman confirmed that he added the word "reasonable" to the personal services exception, but did not define it. Holzman admitted that if Richard was the only person to receive a non-competition agreement, Lisa would not be entitled to that payment.

¶ 92    On redirect examination, Holzman described the Share Agreement as "repetitive" because there was an "inability to envision what may else had been captured or what would fall into the category of "contingent payment based on the occurrence of future events." Holzman also admitted that other topics had not been addressed in the Share Agreement, such as escrow payments or holdback payments, which would have been considered contingent payments. Holzman testified that if two or three shareholders received non-competition agreements, Lisa would be so entitled.

¶ 93    Following the end of the trial, the parties submitted written closing arguments.

¶ 94                                    4. Trial Court Ruling

¶ 95    On July 30, 2020, the trial court entered its 61-page order on Lisa's petition for maintenance and Lisa's declaratory action.[13] With regard to the declaratory action, the trial court stated that the purpose of the MSA was to address the parties' business interests, which, through incorporation of the parties' Share Agreement, intended to define the process of when and how

---

[13] The order was amended *nunc pro tunc* on April 5, 2021.

Lisa would be compensated for her interest in ARI. The trial court stated that each provision of the Share Agreement "strictly relate[d] to the *ownership* of the Shares of ARI, and the attendant rights and obligations of Richard with regard to their respective *ownership* interests in the shares of ARI." (Emphasis in original).

¶ 96     As to the RCA, the trial court observed that the "critical *** determination of whether Lisa [was] entitled to the proceeds of Richard's [RCA] [was] whether Richard received the [RCA] as a shareholder or as a former employee of ARI." The court acknowledged that Richard's role had been twofold, as a shareholder and founder, as well as a "former employee uniquely skilled in the operations of the business." The trial court determined that the RCA had been offered to Richard as "some combination of his position as the founder, president, and chief of the board of ARI, and potential future competitor of Menasha," but not as a shareholder. The court further found that the RCA payments constituted non-competition payments that were "consideration for additional obligations he ha[d] undertaken as part of that agreement, specifically, as reimbursement for Richard's loss of income from not re-entering the packaging marketplace, his area of expertise, for five years."

¶ 97     The court then turned to section 6 of the Share Agreement, specifically to the phrase "non-competition payments made to shareholders of the Corporation generally." The trial court acknowledged that the isolated phrase "made to the shareholders of the Corporation *generally*" was "susceptible to more than one meaning." However, when considering the context and purpose of the Share Agreement, the court found that "generally" was "unambiguous" and applied to "all shareholders, rather than to a majority of individual, specific shareholders." Further, even if the court found the Share Agreement to be ambiguous, extrinsic evidence supported its conclusion. The court observed that both parties had hired "seasoned attorneys" with "decades of experience

in corporate and transactional law" to negotiate and draft the Share Agreement. The court recognized Holzman and Saxman's differing interpretations, but noted that both interpretations acknowledged Richard's position in ARI as an asset in the transaction. The court observed that the Share Agreement's "purposeful omission" of addressing non-competition payments specific to Richard was "evidence" that the Share Agreement was only meant to address payments received by him as a shareholder.

¶ 98   The court also declined to find the RCA payments to be a net proceed pursuant to the third sentence of section 6, "other property or amounts payable in the [sale or merger of ARI] as deferred or contingent purchase price," or under another catchall sentence, "other contingent payments based on the occurrence of future events." If the RCA fell within these subsections, the court reasoned that such a finding would render the non-competition provision meaningless and violative of established contract principles. Finally, the court also declined to find the RCA payments as net proceeds under the fourth sentence, "any proceeds and other consideration otherwise payable to the equity owners of the Corporation, generally, as a result of such ownership which are paid to Richard by such persons pursuant to any understanding or arrangement." The court reiterated that the term "generally" would include *all* equity owners, not just the majority. As such, the trial court denied count I of Lisa's declaratory action, in favor of Richard.

¶ 99   As to the Consulting Agreement, the trial court noted that the threshold matter was whether it even constituted a valid consulting agreement. The court observed that the agreement lacked certain provisions typically found in consulting agreements, such as any requirements for Richard's availability, any discussion regarding the scope of work, or any specific tasks or projects. The trial court also noted that there was no connection between Richard's compensation and the "accomplishment of any tasks or the quality or value of Richard's services to ARI," and that

Richard would receive payment monthly "without any regard to if and how he performs any consulting services" as he was not required to track time or provide invoices for his services. ARI could also only terminate the agreement pursuant to a final court order upon the finding of a breach of the *RCA*, an entirely separate agreement unrelated to any personal service rendered pursuant to the Consulting Agreement. Finally, Richard's payments continued even after he died, further underscoring the lack of connection between performance and benefits received. However, in considering Saxman's testimony on this issue, the court found that the absence of terms did not necessarily invalidate the Consulting Agreement, but rather emphasized that Richard's benefits were not necessary tied to his specific performance." Accordingly, the court did not find that the consulting agreement was illusory as suggested by Lisa.

¶ 100   The court then turned to section 6 of the Share Agreement, as the agreement dictated that the consulting payments needed to be rendered in connection to "*bona fide personal services* to be performed by Richard" and that mere payment was not enough to be considered reasonable. (Emphasis in original). Ultimately, the court found that the payments had not been reasonable amounts for bona fide personal services, and therefore not exempt from "Net Proceeds."

¶ 101   Because the Share Agreement did not define "reasonable payments" or "bona fide personal services," the court turned to the words' plain and ordinary meanings, finding that "reasonable payments" could not be "excessive" and had to "relate in some fair and proportional way to the value of the services for which they are exchanged." According to the court, Richard had limited contact with Menasha since the sale, his communications were considered unhelpful, and any additional contact had been more personal than professional. Further, Richard had provided no evidence of any work completed for Menasha or ARI to demonstrate his services, and only testified to work he performed to keep himself apprised of industry changes. He also had not provided any

evidence as to what constituted a "reasonable amount" for consulting work in the industry. The court could not "presume these payments are reasonable if Richard provides no services, or at most negligible services, at the rate of $42,000 a month." As such, the court found that Lisa was entitled to 33% of all payments made to Richard under the Consulting Agreement, and granted count II of her declaratory action.[14]

¶ 102   Both parties filed motions for reconsideration, which the trial court denied. This appeal followed.

¶ 103                                        II. ANALYSIS

¶ 104   On appeal, Lisa argues that the trial court erred in determining that she was not entitled to 33% of the proceeds from Richard's RCA. Specifically, Lisa contends that Richard's RCA falls within the definition of "Net Proceeds" as dictated by the unambiguous provisions of section 6 of the Share Agreement. Alternatively, in the event that this court should find section 6 ambiguous, Lisa urges that the extrinsic evidence shown at trial still compels the same conclusion.

¶ 105   Richard has filed a cross-appeal in this matter. As a preliminary matter, we observe that in Richard's docketing statement, he indicates that the two issues for review are: (1) the trial court's judgment that Lisa was entitled to 33% of his Consulting Agreement; and (2) the court's awarding of continuing maintenance to Lisa. However, his brief fails to present any argument as to the latter issue. As such, any argument on the continuing maintenance issue is forfeited pursuant to Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (appellant's brief must contain contentions along with citations to the authorities and pages in the record upon which it relies, and "[p]oints not argued

---

[14] As to Lisa's petition for maintenance, the trial court concluded that Lisa was entitled to an award of indefinite maintenance at $6,500 a month, retroactive to November 1, 2017. The court later modified this ruling to make the payments retroactive to February 2018.

are forfeited and shall not be raised in the reply brief, oral argument, or on a petition for rehearing.").Thus, the remaining issue in Richard's cross-appeal is whether the trial court erred in determining that Lisa is entitled to 33% of Richard's Consulting Agreement. Because our review of the RCA and Consulting Agreements require interpretation of the Share Agreement, we address them in tandem.

¶ 106                                    A. Standard of Review

¶ 107    Lisa argues that the correct standard of review is *de novo*, as both appeals concern contract interpretation. Lisa acknowledges that the trial court took in both oral and documentary evidence, which generally presents a mixed question of law and fact, but nevertheless, maintains that *de novo* is the appropriate standard. Richard posits that although the trial court's interpretation of the Share Agreement would generally be *de novo*, the record presents mixed questions of law and fact because the court's ultimate conclusions were based on parol evidence. Thus, Richard contends that the correct standard is whether the trial court's findings were against the manifest weight of the evidence. We agree with Richard.

¶ 108 We acknowledge that parts of the trial court order present questions of contract interpretation, which would ordinarily be reviewed *de novo* as a question of law. See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005); see also *William Blair and Co., LLC, v. Florida Liquidation Corp.*, 358 Ill. App. 3d 324, 334 (2005) ("Contract construction and interpretation are generally well suited to disposition by summary judgment."). For instance, although the trial court found that in isolation, the word "generally" was "susceptible to more than one meaning," it did not find that the entire Share Agreement was ambiguous. See *William Blair and Co., LLC*, 358 Ill. App. 3d at 334 ("A contract is not ambiguous *** if a court can ascertain its meaning from the general contract language."). Additionally, the parties agree that the Share

Agreement, the document governing the court's review, is unambiguous.[15] See *Id.* ("The mere fact that the parties disagree as to the meaning of a term does not make that term ambiguous.").

¶ 109    However, earlier in the litigation when addressing Richard's motion to reconsider, the trial court found that the Consulting Agreement could not be reconciled with the Share Agreement on its face, and ultimately decided the same for the RCA once it reversed its original judgment in favor of Lisa. This implies that the trial court did find ambiguities within the relevant papers and as the court's order shows, it considered extrinsic evidence for its findings on both the RCA and Consulting Agreement. Moreover, the trial court conducted a bench trial on both issues, and typically under those circumstances, a reviewing court will not substitute its judgment for that of the trial court unless the judgment is against the manifest weight of the evidence. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise, Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). Further, an award of damages was entered by the trial court in favor of Lisa with regard to the Consulting Agreement. "When an award of damages is made after a bench trial, the standard of review is whether the trial court's judgment is against the manifest weight of the evidence." *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 133. Thus, in overturning a damage award, "a reviewing court must find that the trial judge either ignored the evidence or that its measure of damages was erroneous as a matter of law." *Id.*

¶ 110    Accordingly, we assess the trial court's order under the manifest weight of the evidence standard. "A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent, or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Chicago's Pizza, Inc.*, 384 Ill. App. 3d at 859. The trial judge, as the trier of fact, is in

---

[15] We observe, however, that at least once before the trial court, Richard argued that the Share Agreement *was* ambiguous, a fact also pointed out by Lisa during trial court proceedings.

the best position to assess the credibility of the witnesses and determine the weight to be given their testimony. *Id.* Accordingly, we "give great deference to the [trial court's] credibility determinations." *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277, ¶ 52. An appellate court will not disturb the trial court's factual findings unless a contrary finding is clearly apparent. *Id.*

¶ 111                                  B. RCA

¶ 112   Lisa contends that the RCA payments constitute "net proceeds" to which she is entitled under various provisions of section 6 of the Share Agreement. She cites specifically to the following four provisions: (1) "total proceeds and other consideration actually received by the trustee as the holder of shares in connection with a transaction"; (2) "non-competition payments made to shareholders of the corporation generally"; (3) "contingent payments based on the occurrence of future events"; and (4) "other property or amounts payable in the transaction as deferred or contingent purchase price." Lisa argues that, as noted by the trial court, all such provisions are unambiguous, and should be read as drafted. However, in the event that this court should disagree, the evidence taken at trial supports any of the findings above.

¶ 113  Not surprisingly, Richard disagrees, arguing that the trial court was correct in its determination that the RCA had been offered to him as an executive and manager of ARI, and not as a shareholder. Further, Richard contends, the trial court correctly interpreted the term "generally" to mean that such payments needed to be given to *all* of the shareholders in order to entitle Lisa to such proceeds.

¶ 114   There is no dispute that the RCA is a non-competition agreement. For general context, Black's Law Dictionary defines a "non-competition covenant," also referred to as "noncompetition agreements" or "restrictive covenants," as "a promise, usually in a sale-of-business, partnership,

or employment contract, not to engage in the same type of business for a stated time in the same market as the buyer, partner, or employer." *Non-competition covenant*, Black's Law Dictionary 420 (11th ed. 2019) Such agreements are "valid to protect business goodwill in the sale of a company." *Id.*

¶ 115 Section 6 of the Share Agreement dictates Lisa's entitlement to the proceeds of any sale of assets, shares, or merger of ARI. In order to be entitled to 33% of such proceeds, such an event must fall within the definition of "Net Proceeds," which is defined numerous times throughout that section. Thus, we must consider whether either of the four provisions in the Share Agreement supports a conclusion that proceeds generated from the RCA constitute "net proceeds."

¶ 116 Well-established principles of contract interpretation govern our review of both the RCA and the Consulting Agreement. When "construing a contract, the primary objective is to give effect to the intention of the parties." *C.O.A.L., Inc. v. Dana Hotel*, *LLC*, 2017 IL App (1st) 161048, ¶ 58. "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id.* We do not glean the intention of the parties by looking at any clause or provision in isolation, or by looking at "detached" portions of the agreement. *Id.* A court also will not interpret a contract in a manner that nullifies or renders a provision meaningless, as "when parties agree to and insert language into a contract, it is presumed that it was done purposefully[.]" *C.O.A.L., Inc.*, 2017 IL App (1st) 161048, ¶ 58 (quoting *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011))."Contract terms should also be interpreted in accordance with the custom and usage of those particular terms in the trade or industry of the parties." *Intersport, Inc. v. National Collegiate Athletic Association*,

381 Ill. App. 3d 312, 319 (2008). The court "must *** place itself in the position of the parties at the time they entered into the agreement," which might require "enlarg[ing] or limiti[ing]" the "language in the contract" as dictated by the "attendant circumstances of the contract and its purpose." *Id.*

¶ 117    Additionally, if the "language of the contract is susceptible to more than one meaning, it is ambiguous." *Gallagher*, 226 Ill. 2d at 233. However, "[t]he mere fact that the parties *disagree* as to the meaning of a term does not render that term ambiguous." *Intersport, Inc.*, 381 Ill. App. 3d at 320. (Emphasis added). "Where there is no ambiguity, the court will ascribe to the terms their plain and ordinary meaning," as well as "evidence of the custom and usage of the terms in the parties' trade or practice." *Id.* If a term is ambiguous, "a court may consider extrinsic evidence to ascertain the parties' intent." *Gallagher*, 226 Ill. 2d at 233. Finally, when "instruments [are] executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction," we regard the relevant contracts as "one contract" and will construe them together. *Id.* Here, the MSA, VTA, and Share Agreement were all executed by Lisa and Richard contemporaneously during their divorce proceedings, while the RCA and Consulting Agreements were entered into by Richard and Menasha/ARI in conjunction with the sale of ARI.

### 1. *Purpose of the Share Agreement*

¶ 118    Preliminarily, Lisa argues that the purpose of the Share Agreement was to protect her beneficial interest upon the sale of ARI. The trial court disagreed with this interpretation, finding that the Share Agreement formalized the procedure in which Lisa would be compensated for her interest in ARI. Although the Share Agreement, along with the MSA and the VTA, by design, protect each parties' interests, we perceive the ultimate purpose of the agreements as identifying and directing the management and distribution of marital property. Section 3.8 of the MSA,

entitled "Business Interests," states that Richard owned common stock in ARI, and that the parties had agreed that Lisa be entitled to 33% of Richard's interest in ARI, solidified by the Share Agreement and VTA. The Share Agreement further elaborated that "[a]s part of the property settlement between Lisa and Richard in their divorce proceeding, they have agreed that Lisa will have certain rights to the Shares." The Share Agreement also details how Richard, as shareholder, would exercise any rights regarding the maintenance, sale, or acquisition of additional stock, while the VTA provided that Richard would serve as Lisa's fiduciary with regard to her 33%. Thus, we read the three contracts as solidifying the parties' agreement with regard to maintenance and eventual sale of certain property assets.

### 2. *Richard's Role*

¶ 119    Next, as did the trial court, we consider first whether "non-competition payments made to the shareholders of the corporation generally" constitutes "net proceeds." Overall, the RCA sought to protect ARI/Menasha's "business, intellectual property, trade secrets and confidential information" for a certain period of time, given that Richard had developed "unique relationship[s]" with ARI's customers through "unique and extensive exposure to and personal contact." See Sec. 3(a) of RCA. We observe that section 2 prohibits competition from Richard not just as an employee, but as a "agent, partner, officer, principal, director, shareholder, consultant, lender or in any other capacity whatsoever." However, the same section *does* allow for Richard to become a "passive owner of not more than 5% of the outstanding stock of a corporation which is publicly traded," so long as he has no "active participation in the business of such corporation."

¶ 120    When examining the totality of the RCA, the trial court determined that the RCA payments were made to Richard as a "combination of his position as the founder, president, and chief of the board of ARI," rather than as a shareholder. Here on appeal, Richard puts forth the same

contention, that "restrictive covenant agreements are demanded of *executives*, not shareholders." (Emphasis added). This observation is not entirely unreasonable, given that Richard is also subject to a Consulting Agreement to provide independent contractor services to ARI/Menasha, which we will discuss later in this disposition. However, the plain language of the RCA expressly provides that it seeks to prohibit Richard not just as an executive or employee, but *also* as a principal, director, shareholder, lender, or in any "conceivable capacity." Thus, we believe the intent of the RCA was to encapsulate Richard's overall influence as a player in the packaging industry, and not necessarily just as an employee. Moreover, we do not think Richard's roles as founder, employee, and shareholder can be so easily divorced, given the nature and duality of his roles in the companies at the time of sale. Richard's own testimony acknowledged that the RCA and Consulting Agreements were required parts of the sales transaction, and that although he had contemplated a consulting agreement, he had not known that he would be receiving two separate agreements. Finally, it was Saxman's testimony that the two agreements were inherently tied together in the transaction.

¶ 121   However, even if the intent of the RCA was to prohibit Richard's activities solely as an employee, and not as a shareholder, contrary to Richard's contention, that does not end the analysis. The court was still required to interpret the RCA against the Share Agreement. As we explain below, in light of the plain language of the Share Agreement, we believe that here, the distinction between employee and shareholder is one without a difference.

¶ 122   We reiterate that the Share Agreement was entered into four years prior to the RCA, and its purpose was to govern the ownership of Richard's stock in ARI at the time of his and Lisa's divorce proceeding, a finding also made by the trial court. While the trial court made much of the fact that the Share Agreement failed to account for the possibility of Richard receiving a non-

competition agreement as an employee rather than a shareholder, we do not find such an "omission" to be so "purposeful" given the overall subject matter of the contract. As noted by the court, the Share Agreement governs *ownership* of ARI stock, not employment-specific matters.

¶ 123 Further, the plain language of the Share Agreement expressly contemplates *non-competition payments* made to *shareholders.* Although the terms "corporation" and "shares" are defined therein, "shareholder" is not, so we turn to the plain and ordinary meaning. *Intersport, Inc.*, 381 Ill. App. 3d at 320 ("Where there is no ambiguity, the court will ascribe to the terms their plain and ordinary meaning" as "contract terms need not be found to be ambiguous before evidence of the custom and usage of the terms in the parties' trade or practice can be considered."); see also *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 436 (2010) (where a term is undefined in a contract, courts may ascertain the "plain, ordinary, and popular meaning" by referring to dictionary definitions). Merriam-Webster's Dictionary defines a "shareholder" as "[o]ne that holds or owns a share in property," and Black's Law Dictionary describes it as "one who owns or holds a share or shares in a company, especially a corporation." *Shareholder*, Merriam-Webster's Dictionary 1077 (10th ed. 1998); *Shareholder*, Black's Law Dictionary 1500 (11th ed. 2019). It is undisputed that at the time the Share Agreement was executed, Richard was a shareholder, and was one as well at the time ARI was sold.

¶ 124 We further observe that section 6 also utilizes the term "equity owner," specifically in the provision that "[n]et proceeds will also include any proceeds and other consideration otherwise payable to the *equity* owners of the Corporation, *generally*, as a result of such ownership which are paid to Richard by such persons pursuant to any understanding or agreement." (Emphasis added). "Equity owner" is also not defined in the Share Agreement. Merriam-Webster's defines "equity" as the "3a. A right, claim, or interest existing or valid in equity. 3b. The money value of

a property or of an interest in a property in excess of claims or liens against it. ** 3d. The common stock of a corporation." *Equity*, Merriam-Webster's Dictionary 392 (10th ed. 1998). Black's Law Dictionary articulates it as "a right, interest, or remedy recognizable by a court of equity." *Equity*, Black's Law Dictionary (11th ed. 2019). Although "equity owner" and "shareholder" are different terms, their definitions appear to be synonymous, and the record reflects that Saxman also viewed the two as such.

¶ 125   The trial court also made much of the fact that the drafters of the Share Agreement were "seasoned attorneys," and that although neither could truly predict how and when ARI would be sold, non-competition agreements to individuals such as Richard were likely and it was "revealing" that the agreement did not contain language to that effect. We see it differently. Both Saxman and Holzman intended the Share Agreement to be read broadly, which is reflected by the Share Agreement's sole exception to "net proceeds" being employment and consulting agreements. Additionally, the first definition of "net proceeds" is broadly defined as the "total proceeds and other consideration," and the agreement utilizes the term "include" when providing specific examples of what falls within such a definition, but does not express any further limitation other than the single exception discussed above. Both Saxman and Holzman were aware of Richard's dual role as a shareholder and corporate manager, and thus most certainly could have anticipated a situation where Richard might be offered a non-competition agreement solely as an employee and not a shareholder, and how that could affect Lisa and Richard's division of assets.

¶ 126   Indeed, the plain language of the Share Agreement contemplates the many hats worn by Richard and his own unique position in the companies. Within section 6, the Share Agreement specifically identifies Richard in his role as Trustee, where "net proceeds" is also defined as "the *total proceeds* and *other consideration actually received by* the Trustee as *the holder of shares* in

connection with a Transaction, net of all reasonable fees and expenses of the Transaction which are borne by the Corporation's shareholders." (Emphasis added). Additionally, section 6 also defines a "net proceed" as "payment for Richard's personal goodwill," which, again, although undefined, certainly singles out Richard as a key player in the business, and arguably, may even encapsulate the proceeds of the RCA on its own. Thus, if the parties had intended for Richard's role as corporate manager to be divorced from that of his enduring shareholder status, that would have been addressed. Indeed, his potential future role as a consultant or some other kind of employee is actually contemplated by section 6's express exemptions for employment and consulting agreements in the event of a sale.

### 3. *Interpreting "Generally"*

¶ 127   With these considerations in mind, we turn to the trial court's interpretation of the word "generally" as the final piece of the puzzle. The trial court ultimately found that in order for a non-competition payment to qualify as a net proceed, it would have to be offered to *all* the shareholders rather than a few select individuals such as Richard. The trial court reasoned that, when read in isolation, the term "generally" *could be* susceptible to at least two meanings, but overall, the Share Agreement was not ambiguous. The main testimony relied upon by the trial court were the dueling interpretations between Richard and Lisa's corporate counsel during their divorce proceedings. Both viewed the term differently, yet never discussed the interpretation together. Holzman characterized the term to mean "a majority or more," while Saxman understood it to mean "all." The trial court ultimately agreed with Saxman that "generally" meant "all," as it found this interpretation consistent with the purpose of the Share Agreement, which was "to detail the parties' interest in Richard's ownership in ARI as a holder of shares, rather than any individual role Richard may have as a uniquely skilled former employee of ARI." Notably, the court downplayed

testimony that indicated that the RCA "was part of the discussions of the sale of ARI from the very beginning and the total benefits of all the additional agreements comprise[d] a significant portion of the total [$40 million] exchanged as part of the sale of ARI."

¶ 128    Again, the term "generally" is not defined in the agreement, and the record demonstrates that neither drafter found the term to be controversial at the time of execution. However, it is clear that Holzman and Saxman thought of the term differently. We turn again to the plain and ordinary meaning. Merriam-Webster's Dictionary defines "generally" as "(a) in disregard of specific instances and with regard to an overall picture. (b) (as a rule) *usually.*" *Generally*, Merriam-Webster's Dictionary 485 (10th ed. 1998). (Emphasis added). Such synonyms include words such as "commonly, normally, ordinarily, typically, usually."[16] Thus, the common dictionary usage does not match Saxman's understanding of the word "all" and adds an additional qualifier that does not exist in the language of the agreement. *Empress Casino Joliet Corp. v. W.E. O'Neil Construction Co.*, 2016 IL App (1st) 151166, ¶ 62 (courts "will not add language or matters to a contract about which the instrument is silent, nor add words or terms to the agreement to change the plain meaning[.]").

¶ 129    We also find persuasive that in the same section, "net proceeds" is also defined as "the *total proceeds* and *other consideration actually received by* the Trustee as the holder of shares in connection with a Transaction, net of all reasonable fees and expenses of the Transaction which are borne by *the Corporation's shareholders*." (Emphasis added). We notice that the word "generally" is not used in conjunction with "shareholder," and that "net proceeds" is defined to

---

[16]    "Generally," *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/generally. Accessed 10/4/2022.

encompass the *total* proceeds and ancillary consideration received by the Trustee, Richard. See

*Taracorp, Inc. v. NL Industries, Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) ("When parties to the same

contract use such different language to address parallel issues *** it is reasonable to infer that they

intend this language to mean different things.") (applying Illinois law); see *also Trustees of Iron*

*Workers Local 473 Pension Trust v. Allied Product Corp.*, 872 F.2d 208, 213 (7th Cir. 1989)

(determining that the common meaning of the word "all" is 100%, when compared to modifier

phrases such as "substantially all" or "virtually all" contained within the same statutory scheme),

*cert. denied*, 493 U.S. 847 (1989). Thus, even if the RCA had not been directed to Richard's role

as a "holder of the shares," the RCA still reasonably constitutes "other consideration" received by

him, as evidenced by Reents's testimony regarding the negotiations of the sale.

¶ 130   We are mindful of the deference afforded to the trial court on a manifest weight of the

evidence standard. Perhaps if Richard had been the sole individual to receive the RCA, the

outcome would be different. Instead, Gary, also a shareholder and corporate manager, received a

non-competition agreement, a fact that is not disputed by the parties, although we note that his

agreement does not appear to have been in evidence, nor was he called to testify. The only

shareholder who did not receive a non-compete agreement was Michael Banks, who appears to

have been inactive with the company at the time of sale. Thus, we acknowledge that the

conclusions drawn from the trial court are not unreasonable or arbitrary. We also acknowledge

that courts of review are not to overturn decisions of the trial court simply because we may disagree

with them. *Bernstein and Grazian, P.C. v. Grazian and Volpe, P.C.*, 402 Ill. App. 3d 961, 926-927

(2010).

¶ 131   But our review of the trial court's determinations following trial also contemplates whether

the "opposite conclusion is apparent." *Chicago's Pizza, Inc.,* 384 Ill. App. 3d at 859. We cannot

ignore certain key pieces of evidence that were before the court, such as the plain meaning of the term "generally," which, as the trial court acknowledged, that when read is isolation, is susceptible to two meanings. Additionally, the evidence showed that neither drafter of the Share Agreement understood the term "generally" to mean the same. Thus, traditional principles that resolve any remaining ambiguities against the drafter of the Share Agreement do not aid us here, because even though Saxman drafted the initial version, Holzman also edited and contributed to its final version. See *William Blair and Co., LLC*, 358 Ill. App. 3d at 345 (noting that *contra proferentem* is a secondary rule of interpretation that is only invoked after "ordinary interpretive guides have been exhausted.").

¶ 132   Ultimately, when construed with the rest of the Share Agreement and its general purpose, which was intended to be broad in scope due to the uncertainty of ARI's future, along with the sole exclusion contained with section 6 that specifically references what would *not* be included in "net proceeds," *i.e.* employment and consulting agreements, we find that this evidence tips the balance in Lisa's favor. We do conclude that the opposite conclusion is apparent, and therefore find that Lisa is entitled to 33% of the RCA proceeds pursuant to the non-competition payments provision of the Share Agreement.

¶ 133   Finally, we observe that the trial court also found that the RCA did not constitute "deferred or contingent purchase price" or "contingent payments based on the occurrence of future events" because such provisions would "nullify or render [those] provisions meaningless." Lisa also argues that she was entitled to the payments for both of those reasons. However, given that we have assessed the totality of the Share Agreement, we are mindful that if there is any conflict or ambiguity between two provisions, "the more specific controls over the more general provision." *R.W. Dunteman Co. v. Village of Lombard*, 281 Ill. App. 3d 929, 936 (1996). As we have ultimately

determined that the RCA falls within the scope of the Share Agreement as a non-competition agreement, we express no specific opinion with regard to the other provisions in isolation. The evidence demonstrates that a non-competition agreement was at issue before the court, which is best and appropriately assessed by the provision of the Share Agreement that governs that type of contract.[17]

¶ 134                                    C. Consulting Agreement

¶ 135   In his cross-appeal, Richard argues that the trial court erred in finding that Lisa was entitled to the Consulting Agreement's payments. Richard's position is that the trial court's entire conclusion was based on its assumption that the terms of the Consulting Agreement were "too favorable" to him, and that just because the agreement was not "typical" does not mean it was unenforceable. Richard argues that all that was relevant was that "Menasha believed it was worth $3,600,000 over five years for the company to keep Richard and [Gary] available."

¶ 136 Lisa disagrees, contending that the trial court erred in determining the Consulting Agreement was not illusory because its terms were vague. However, Lisa agrees with the trial court's determinations that the agreement's payments were not reasonable, and Richard did not

---

[17] We also express no opinion as to Lisa's contention that Richard "knowingly" sought to "divert proceeds from ARI's sale away from Lisa to himself." While we acknowledge that a great deal of testimony was elicited regarding the timeline of the sales negotiations to bolster Lisa's theory that Richard's actions were nefarious, we note that Lisa did not bring forth a claim alleging breach of fiduciary duty by Richard, and ultimately, the issues before us concerned contract interpretation. The parties also acknowledge that we can reach the legal issues before us without any consideration as to motive.

Finally, we observe that Lisa also attempted to argue that per the RCA agreement, all three shareholders could also be considered a "seller affiliate" per the terms of the agreement and thus also fall within the scope of the non-competition provision in the Share Agreement. We agree with Richard that this theory of interpretation was not raised before the trial court, is raised for the first time here, and thus is forfeited. See *Shell Oil Co. v. Department of Revenue*, 95 Ill. 2d 541, 550 (1983) ("It is axiomatic that questions not raised in the trial court *** may not be raised for the first time on appeal.").

provide *bona fide* services.[18] Lisa retorts that it is of no import as to whether the Consulting Agreement is enforceable; instead, what matters is that the contract was the type of consulting agreement contemplated by the Share Agreement.

¶ 137   We return to the Share Agreement. Section 6 contains an exception to Lisa's entitlement, where "net proceeds will not include any reasonable amounts payable in connection with bona fide personal services to be performed by Richard after the closing of the Transaction under a consulting or employment agreement, or under any employee benefit plan." In its order, the trial court's inquiry focused first on whether the Consulting Agreement was even a proper consulting agreement, and then, whether the payments therein were reasonable for the services provided. Although the trial court characterized the agreement as "lack[ing] certain provisions typical in consulting agreements," it nevertheless found the Consulting Agreement to be valid but "not necessarily tied to the performance of any specific duties."

¶ 138   The trial court then assessed whether the payments made under the consulting agreement were excluded from the definition of "net proceeds," and found that they were not. Because the agreement did not necessarily tie Richard's monthly payments of $42,000 to any goals or specific duties, the court found such payments to be unreasonable in that they were "excessive" because Richard had provided minimal services to Menasha since execution of the agreement. Although the court acknowledged that no evidence had been proffered as to what a "reasonable payment"

---

[18] Lisa argues that Richard has "forfeited" any argument on appeal with regard to Menasha and his intention with regard to the Consulting Agreement. Richard's argument on cross-appeal is that the court should have more closely focused on the "intent" of the parties who executed the Consulting Agreement. We do not view this as a new legal theory, as Richard put forth evidence at trial regarding how the Consulting Agreement came to be, and more importantly, identifying the intent of the parties is inherent in any contractual interpretation analysis. Thus, we find this forfeiture argument meritless.

would be in the consulting industry, the court nevertheless found that these payments did not qualify for the exception outlined in section 6, and that Lisa should be entitled to 33%.

¶ 139 The Share Agreement does not provide any indication of what may constitute a "reasonable" payment. As the trial court did, we turn to the plain and ordinary meaning. "Reasonable" means "1b. Not extreme or excessive. 1c. Moderate/fair ([as to] price." *Reasonable*, Merriam-Webster's Dictionary 974 (10th ed. 1998). It may also mean "1. Fair, proper or moderate under the circumstances." *Reasonable*, Black's Law Dictionary 1518 (11th ed. 2019). "Bona fide" means "1. Made in good faith; without fraud or deceit. 2. Sincere; genuine." *Bona fide*, Black's Law Dictionary 217 (11th ed. 2019); see also Merriam-Webster's 130 (10th ed. 1998) ("1. Made in good faith without fraud or deceit."). Thus, any consulting or employment agreement that is excluded from the definition of "net proceeds" must not be "excessive" and should be "fair" in relation to any good-faith work performed by Richard.

¶ 140 Richard's role as a consultant was on an "as-needed basis, at mutually agreeable times" at the request of any authorized ARI official for a period of five years. Richard was to reimbursed for any out-of-pocket expenses incurred as a result of his services, and even after death would still be paid, albeit to his intended beneficiaries. Further, the agreement would continue indefinitely until determined otherwise by a final court order. When reviewing the agreement, we agree with the trial court that it appears to lack certain defined elements that Lisa's expert witness, Dolan, opined upon in his testimony, such as achievable goals and any formalized requirements to document Richard's work.

¶ 141 However, Saxman testified that consulting agreements that are ancillary to M&A agreements may not be specific because the buyer may simply want individuals to be "on call" and future services may not yet be known. Further, there is nothing in the record to demonstrate

that this was not an arms-length transaction. Menasha and Richard, through Saxman, were represented by counsel, and it was Saxman's testimony that Menasha created the first version of the agreement. We are mindful "[i]t is not necessary that [a] contract provide for every collateral matter or every possible future contingency which might arise in regard to the transaction." *In re Marriage of Haller*, 2012 IL App (5th) 110478, ¶ 28 (quoting *Morey v. Hoffman*, 12 Ill. 2d 125, 130-131 (1957)). Further, as correctly noted by Lisa, the issue of the Consulting Agreement's *enforceability* is not before us today, as no party privy to the actual contract challenges the agreement as a whole, and Lisa's own expert witness did not opine as to whether the contract would be enforceable in court. Thus, we defer to the trial court's finding that, although "unusual," the absence of such terms did not render the agreement illusory *per se*.

¶ 142 Our concern with the trial court's finding on this issue lies with its assessment of the "reasonableness" of Richard's payments in relation to his services. We reiterate that this was Lisa's action for declaratory judgment, and although the trial court pointed out that Richard had failed to provide evidence of his work performed for Menasha, ultimately it was Lisa's burden to establish by a preponderance of the evidence that the consulting payments were so unreasonable as to fall outside of the express exception contained within the Share Agreement. See *Farmers Auto Insurance Ass'n v. Gitelson*, 344 Ill. App. 3d 888, 896 (2003) ("The burden of proof in a civil proceeding generally rests on the party requesting relief," thus the "plaintiff in a declaratory judgment action bears the burden of proof."). Although we give deference to the trial court's credibility determinations, much of the court's analysis as to the reasonableness of the payments relied on what appears to be the trial court's assumption as to what constituted a fair payment for services rendered. The trial court expressed no particular expertise in this particular industry, and heard no testimony as to whether Richard's monthly payments were proportional to the value

Menasha attributed to him. See *Intersport, Inc.*, 381 Ill. App. 3d at 319 ("Contract terms should also be interpreted in accordance with the custom and usage of those particular terms in the trade or industry of the parties."). Instead, the record demonstrates that Menasha valued Richard enough to require him to sign a consulting agreement, at $9 million to be split among him and Gary. Further, the court acknowledged multiple times that Richard was a "highly skilled" worker, which suggests that the value of Richard's contract may have been in alignment with what he was paid.

¶ 143   Finally, although the court found the agreement to be "unusual," it did not find it to be "illusory." Instead, it determined that the consulting agreement was not one that tied Richard's performance to any specific duties, a choice made between Menasha and Richard. Thus, the trial court's finding that Richard's monthly payments for "negligible services" appears to be inconsistent with its own conclusion that payment structure was not tied to specific accomplishments or quantifiable service. Regardless, the record is clear that *some* services were provided, with the onus on Menasha to decide when it needed Richard's assistance. Even assuming that, as shown by Menasha's trial stipulations, certain Menasha employees believed that Richard's services to date had been "unhelpful," that does not mean that they were *not* provided in good faith, and therefore not bona fide.

¶ 144   Again, it was Lisa's burden on her declaratory action to establish the connection between what would constitute a reasonable payment in light of the services provided. Her expert witness did not proffer any such testimony either in court or in his written report as to the payments, and acknowledged that the Consulting Agreement had been "negotiated" between Menasha and ARI. Thus, based on the limited evidence before the trial court on this issue, we believe a contrary conclusion is clearly evident regarding the Consulting Agreement. We do not believe that Lisa presented sufficient evidence to meet her burden to establish that, based on the circumstances, the

Consulting Agreement was unreasonable and therefore fell within the scope of "net proceeds." As such, we do not believe Lisa is entitled to 33% of Richard's proceeds from the Consulting Agreement, and also reverse on this basis.

¶ 145                    D. Lisa's Request for Additional Maintenance

¶ 146   Finally, in her response brief to Richard's cross-appeal, Lisa argues that, in the event of reversal of any judgment in her favor, she is entitled to a recalculation of additional maintenance payments. We earlier determined that the issue of continuing maintenance identified in Richard's docketing statement was forfeited. Lisa's requested relief, raised for the first time in her response brief, is not properly before us. That said, nothing precludes the parties from pursuing issues regarding maintenance upon remand to the trial court.

¶ 147                        III. CONCLUSION

¶ 148   For the reasons stated, we reverse the judgment of the trial court in its entirety, and remand for further proceedings.

¶ 149   Reversed and remanded.